# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, JANE DOE NO. 2, and JANE DOE NO. 3, ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Docket No. C.A. 17-cv-11069-LTS |
| BACKPAGE.COM, LLC, CARL FERRER, MICHAEL LACEY, and JAMES LARKIN, ) ) ) ) | |
| Defendants. ) | |

## JOINT STATUS REPORT

Pursuant to the Court's Order on Defendants' Motion to Dismiss that permitted the parties to "take discovery focused on the changes, if any, made by Defendants or their agents in the course of posting advertisements describing or referring to Jane Doe No. 3" (Order on Motion to Dismiss, Dkt. 44, at 2 (the "Order")), the parties hereby submit this Joint Status Report to inform the Court of the status of discovery and to propose ensuing steps in this action.

### I.      BACKGROUND AND STATUS

The Court's Order provided that, given allegations "that Defendants or Backpage added content not provided by the proposed advertisement (that Jane Doe No. 3 was an adult), tempered by the general nature of the redrafting allegation made, as it is, on information and belief," Plaintiffs would be permitted to "take some tailored discovery to clarify the redrafting allegation." (Order, Dkt. 44, at 2).

Before Backpage could search for and produce information pursuant to the Court's Order, it required certain identifying information concerning Jane Doe No. 3 from Plaintiffs. On January 25, 2018, the parties moved that a protective order entered on July 24, 2017 (Dkt. 28), be

expanded to protect such identifying information. (Dkt. 47).   On January 26, 2018, the Court granted that motion. (Dkts. 48-49).   On February 22, 2018, the parties moved for a more comprehensive protective order, which the Court allowed on February 26. (Dkt. 50-52).

On January 26, 2018, Plaintiffs propounded Interrogatories and Document Requests to Defendants (collectively, "Plaintiffs' First Requests").   On February 5, 2018, Plaintiffs served Defendants with Supplemental Discovery Requests No. 1 ("Plaintiffs' Supplemental Request," and together with Plaintiffs' First Requests, "Plaintiffs' Discovery Requests").   On January 29, 2018, Defendants propounded Interrogatories and Document Requests on Plaintiffs (collectively, "Defendants' Discovery Requests").   The parties timely responded to the respective discovery.

Defendants responded to Plaintiffs' Discovery Requests on February 26, 2018, with two separate sets of responses, one set on behalf of Defendant Backpage (the "Backpage Response") and one set on behalf of Carl Ferrer, Michael Lacey, and James Larkin (the "Individual Defendants' Response").   The Backpage Response included a production of 38 documents, consisting of nineteen advertisements and nineteen documents with administrative data relating to those ads.   Plaintiffs subsequently confirmed that three of those advertisements did not relate to Jane Doe No. 3.   The Individual Defendants' Response did not include the production of any documents, as the Individual Defendants invoked their Fifth Amendment right against self-incrimination in response to each of Plaintiffs' document requests and interrogatories.   Plaintiffs responded to Defendants' Discovery Requests on February 28, 2018, and produced 40 documents ("Plaintiffs' Response").

Plaintiffs sought clarification of certain of Defendants' discovery responses on March 8, 2018, and Defendants responded on March 12, 2018.   By letter also dated March 12, 2018, Defendants requested that Plaintiffs update their discovery responses in light of Backpage's

production of the sixteen ads relating to Jane Doe No. 3.  Plaintiffs responded on March 19, 2018, and served Defendants with (i) Plaintiffs' Supplemental Responses and Objections to Defendants' First Request for Production of Documents[1] and (ii) Plaintiffs' Supplemental Responses and Objections to Defendants' First Set of Interrogatories ("Plaintiffs' Supplemental Response").  Discovery closed under the Order on March 19, 2018.

## II.      PLAINTIFFS' POSITION ON STATUS

**_Summary._**      The purpose of the Order was to allow Plaintiffs to "take some tailored discovery to clarify the[ir] redrafting allegation[s]," which were alleged in the Complaint based "on information and belief."  (Order, Dkt. 44, at 2).  Plaintiffs' Discovery Requests sought the production of advertisements of Jane Doe No. 3 from 2014 through 2016, any documents concerning the moderation of those advertisements, and internal documents concerning the Defendants' practices for editing or altering proposed advertisements.  To assist Defendants in their search, Plaintiffs provided certain "Jane Doe No. 3 Identifying Information," including an email address, two telephone numbers, and certain key words and geographic locations.  This information reflected Jane Doe No. 3's recollections, particularly of advertisements placed in 2016 when Jane Doe No. 3's trafficker began directing her to place advertisements on Backpage.com using that email address, and was intended to assist Defendants in locating advertisements and related documents both from 2016 and from earlier years, when Jane Doe No. 3's knowledge of potential identifying information is much more limited.  In response to each discovery request, the Individual Defendants invoked their Fifth Amendment privilege against self-incrimination and refused to provide any information or documents in response to Plaintiffs' Discovery Requests.

---

[1] Plaintiffs' supplemental production of documents consisted of two emails that Plaintiffs identified after serving Plaintiffs' Response.

Although Defendant Backpage did search for and produce a limited number of responsive documents concerning advertisements of Jane Doe No. 3 from 2016, it refused to search for or produce many other documents, relying on a narrow interpretation of the scope of the Order and certain representations by Defendants' counsel regarding the nature of Backpage's data storage practices, as described in more detail below.  With respect to advertisements in 2014 and 2015, Backpage has confirmed its retention of all advertisements after completion of the moderation process in the relevant geographic areas, but it declined to produce them.  Plaintiffs are confident that a review of that larger universe of advertisements would at least enable Plaintiffs to identify those concerning Jane Doe No. 3.  Even if those documents had been produced, however, Backpage failed to respond to requests that it explain whether it retains or destroys advertisements in the form they are originally submitted by users.  (*See* Complaint, Dkt. 1, at ¶ 28).  In the absence of production of advertisements as originally submitted, there is no reliable basis to determine what changes, if any, were made to the text of advertisements in any relevant period.  Defendant Backpage's unsworn assertions that no such changes were made to advertisements from 2016 hardly suffice to establish their truth, and they certainly cannot do so with respect to the universe of advertisements from 2014 and 2015 that Backage did not produce at all.  Indeed, throughout the limited discovery process, Backpage has sought to "establish" a variety of facts through attorney argument rather than by producing requested documents (for instance, documents relating to the moderation process) or making fulsome responses to Plaintiffs' interrogatories.[2]

---

[2] Jane Doe No. 3's responses to Defendants' interrogatories were, consistent with Fed. R. Civ. P. 33(b)(3), signed by Jane Doe No. 3 under oath.  Backpage's responses to Plaintiffs' interrogatories were not signed by any representative of the company; nor did the Individual Defendants sign their own interrogatory responses.

In connection with its limited production of advertisements from 2016, Backpage produced documents showing that it received and reviewed explicit photographs of Jane Doe No. 3, including photographs showing her face.  Indeed, approximately half of the advertisements produced by Backpage include at least partial facial photographs of Jane Doe No. 3.  These documents show that her trafficker used facial photographs on a regular basis and support the reasonable inference that similar photographs were submitted by her trafficker in connection with advertisements in 2014 and 2015, when any reasonable person would conclude that she was a child.  Thus, quite apart from redrafting of the text of advertisements, Jane Doe No. 3 now can make allegations regarding Defendants' alteration of the meaning of advertisements through the manipulation of photographs, similar to those made by Jane Doe No. 2.  (*See* Complaint, Dkt. 1, at ¶ 73).

***Refusal to search for relevant documents.***    The limited scope of production by Backpage described above is the result, at least in part, of its cramped interpretation of the Court's Order.  Backpage contended that Plaintiffs' request for "documents 'concerning . . . Moderation' and/or 'otherwise concerning any alteration' of Advertisements depicting Jane Doe No. 3" was beyond the scope of the Order.  Backpage similarly claimed that Plaintiffs' request for documents concerning the automated Strip Term from Ad filter as "outside the scope" of documents "relevant to 'changes . . . made by Defendants or their agents.'"  Backpage's March 12 letter claimed that such searches were unnecessary because the documents it produced showed that no alterations had been made to the text of any advertisement it produced.  However, as detailed below, Backpage's document production did not include all advertisements featuring Jane Doe No. 3, and more importantly, there is reason to believe, as explained below,

that the "administrative data" produced along with the advertisements is not a reliable indicator of whether alterations were made.

**_Failure to produce relevant documents._**  In addition to the outright refusal to search for documents, even, when Backpage did conduct searches for relevant documents, it then failed to produce all such documents.

1.      **_Hits on relevant keywords._**  Backpage has represented that it searched archived advertisements from 2014-2017 regarding the key words and geographic locations that Plaintiffs provided as "Jane Doe No. 3 Identifying Information."  Instead of producing those documents, however, Backpage produced only advertisements that, in its estimation, "appeared to relate to Jane Doe No. 3."  Backpage's limited approach fails to account for the possibility that Jane Doe No. 3 may have looked different in 2014 than she did in the 2016 advertisements that Backpage did produce. Plaintiffs—not Backpage—are in the best position to assess whether any such advertisements in fact relate to her.

2.      **_Artificial limitation of time period_**.  Another aspect of the process Backpage used to conduct its search systematically excluded relevant documents from the 2014-2015 period. Specifically, Backpage limited its production to advertisements associated with the email address that Plaintiffs provided or a handful of phone numbers associated with that email address. Backpage declined to even review, let alone produce, documents that hit on relevant key words and geographic locations if those documents did not _also_ contain a portion of one of these telephone numbers. As Backpage well knows, it is unlikely that traffickers who submit advertisements for sex with minors on Backpage.com will use a single email address or only a few phone numbers in every advertisement for their victims over a time period spanning years. As Jane Doe No. 3 has stated in Plaintiffs' Response, she (i) is aware that advertisements

featuring her were posted on Backpage.com using other email addresses and phone numbers during the period from 2014 through 2016; and (ii) believes that her trafficker frequently changed the phone numbers that he used in advertisements posted on Backpage.com by using a cell phone application.   If given the opportunity to review a larger number of advertisements located using relevant terms, Plaintiffs could identify additional advertisements involving Jane Doe No. 3.

*3.   As-submitted advertisements.*   To identify text changes made by Backpage, it is critically important to have the form of the advertisement as originally submitted by the trafficker.   Here, Plaintiffs are unable to determine the extent of the changes Backpage made to the text of any advertisement because Backpage apparently does not retain copies of the original advertisements in the form submitted to Backpage.com before undergoing any moderation. When Plaintiffs inquired whether Backpage retains original, pre-moderation advertisements, Backpage avoided answering the question and instead maintained (through unsworn representations of counsel) that the "administrative data" (*i.e.*, electronic data tables reflecting certain administrative metadata and related information) associated with the produced advertisements showed that there had been no changes to the text, so it was irrelevant whether any originals existed.   But Jane Doe No. 3 produced an email which, when compared to the advertisements produced by Backpage, showed that one advertisement had its title changed after it was originally submitted.   Backpage countered with the assertion that the "user" made this change, rather than a Backpage employee or agent, but there is no record or indication in the produced documents that any such edit was made by a user.   This exchange between the parties, *inter alia*, confirms that Backpage does not retain original versions of advertisements (as alleged in the Complaint, Dkt. 1, at ¶ 28), and that it is not possible to discern from the produced

documents whether or how particular changes to the text occurred.  As a result of Backpage's failure to produce the original advertisements or any other credible record of text changes, Plaintiffs are unable to compare pre-moderation to post-moderation language that would aid in revealing any contributions that Defendants made to the text of these advertisements.

    *4.*    ***Deletion and cropping of photos.***    Data from some of the produced advertisements from 2016 indicates that Backpage agents removed photographs from those advertisements, while still accepting the remainder of the advertisement for publication.  Indeed, the administrative data of the produced advertisements reveals that in some of the advertisements, Backpage.com moderators removed photos of Jane Doe No. 3's face.[3]  Jane Doe No. 3 has also stated in Plaintiffs' Supplemental Response that she believes Backpage.com moderators cropped Jane Doe No. 3's face from certain photographs.  Therefore, it is reasonable to infer that the same (or similar) practices were occurring in 2014, and that Backpage.com moderators reviewed and altered photographs of an even younger Jane Doe No. 3 (age 15)— which would have clearly revealed to a reasonable person that she was a minor—and then accepted the remainder the advertisement for publication.

    <u>***Inconsistencies between Backpage's responses and produced documents.***</u>    As noted above, the documents produced by Backpage are not reliable indicators of Defendants' moderation practices.  For example, the electronic data tables accompanying each advertisement contain a series of checkboxes used by the Defendants to indicate whether certain moderation was conducted on each advertisement.  These include checkboxes for, *inter alia*, "Inappropriate Content," "Violated Terms of Use," and "Strip Term From Ad."  Some of the advertisements' data also contains a section for "Deleted Images," which provides the photographic images

---

[3] Despite Backpage's efforts to confuse the issue, it is undisputed that Backpage possessed, in 2016, at least one picture of Jane Doe No. 3's entire face.

themselves and the phrase "Deleted by: [moderator acronym OR 'system']."  The deleted images in the produced documents contain full frontal nudity, which, as Defendants claim, is a violation of their Terms of Use.   However, no advertisement with deleted pictures had either the "Inappropriate Content" or "Violated Terms of Use" checkbox selected, which is inconsistent with the actual result of the moderation process.   Yet, in response to Plaintiffs' request for documents regarding the Strip Term from Ad filter, Backpage cites the absence of any selected "Strip Term From Ad" checkbox as confirmation that no responsive documents exist.   Since the documents produced show no evidence that Defendants consistently used these checkboxes, even when appropriate to do so, Plaintiffs cannot rely on Defendants' assertions and require additional information to determine the true extent of this moderation.

 _**Conclusion.**_   Plaintiffs maintain that this Court can and should deny Defendants' motion to dismiss with respect to Jane Doe No. 3 based on the allegations in the currently operative Complaint.   This limited discovery process further supports Plaintiffs' position.   Despite Defendants' reticence to fully respond to Plaintiffs' Discovery Requests, even the limited information that Defendants produced to date is sufficient to confirm the general plausibility of the original allegations regarding the Defendants' role in "redraft[ing] the advertisement [submitted to Backpage regarding Jane Doe No. 3] to suggest Jane Doe No. 3 was an adult." (Order, Dkt. 44, at 2 (quoting Dkt. 1, at ¶ 78)).   If the Court concludes that further allegations should be included in the Complaint regarding Jane Doe No. 3, Plaintiffs respectfully request that the Court grant them leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).

### III.    DEFENDANTS' POSITION ON STATUS

Backpage searched for and produced all responsive advertisements for the period 2014 through 2017 (to the extent they exist) based on identifying information—*i.e.*, email and telephone number information—and on the specific keywords, that Plaintiffs provided for guiding the search.   Backpage did not refuse to search for responsive documents, nor did it withhold any documents found, other than on the basis of non-responsiveness to the Order and Plaintiff's discovery requests, on the ground that they clearly and obviously did not pertain to Jane Doe No. 3.   The resulting discovery from both sides raises serious questions about whether there was ever any good faith basis for allegations in the complaint concerning Doe No. 3.

Plaintiffs alleged in their Complaint that Jane Doe No. 3 was trafficked in Massachusetts and Florida through classified advertisements posted to the website Backpage.com, "[o]ver the course of several months" commencing "in or around 2014."   (*See* Compl. ¶¶ 75-76).   Plaintiffs further alleged that "Jane Doe No. 3's trafficker paid extra to have the advertisements reposted by Backpage," that the trafficker's ads "plainly communicated that Jane Doe No. 3 was a child," and that "Backpage materially altered that explicit language, removed certain words, and redrafted the advertisement to suggest Jane Doe No. 3 was an adult."   (*See* Compl. ¶¶ 75-76).   In light of Plaintiffs' allegation that Backpage "redrafted" ads relating to Jane Doe No. 3, by "add[ing] content not provided by the proposed advertisement (that Jane Doe No. 3 was an adult)," the Court allowed "limited discovery" targeting the "redrafting allegation."   (Order, Dkt. 44, at 2).

In their discovery requests, Plaintiffs asked Defendants to produce all ads posted to Backpage.com relating to Jane Doe No. 3.   Plaintiffs identified one mail address and two

telephone numbers associated with Jane Doe No. 3, as well as various locales in Massachusetts and Florida in which ads may have run.[4]

Backpage.com searched for ads relating to Jane Doe No. 3 for the various locales identified by Plaintiffs for the years 2014 and 2015, using the email address and phone numbers Plaintiffs provided, but located no ads in either 2014 or 2015.[5] Although the legitimate scope for the discovery requests was 2014 and possibly early 2015, based on Plaintiffs' allegations that Jane Doe No. 3 was trafficked for several months commencing "in or around 2014," Backpage.com also searched its records for 2016 and beyond, up through the date of the Complaint. Backpage located nineteen advertisements posted in Massachusetts and Florida in 2016 using the email address Plaintiffs provided (which appears to be a personal Gmail address for Jane Doe No. 3).[6] Backpage produced thirty-eight documents to Plaintiffs—the nineteen ads plus the administrative data related to each ad. Backpage produced the ads and administrative data related to every one of the ads Plaintiffs subsequently identified in their discovery responses—plus several ads Plaintiffs did not identify. Plaintiffs subsequently notified Defendants that three of the nineteen ads did not relate to Jane Doe No. 3.

---

[4] The principal means by which Backpage is able to search for ads is by the email address used to post an ad; Backpage also has a limited ability to search by telephone number for older ads.

[5] Plaintiffs' suggestion that Backpage "systematically excluded relevant documents from the 2014 – 2015 period" is false. Backpage searched its records, using the email address and telephone numbers Plaintiffs provided, for January 2014 through the filing of the complaint in June 2017. Plaintiffs speculate that ads may have been posted using other email addresses or including other telephone numbers. However, unless Plaintiffs identify those email addresses or telephone numbers, Backpage has no means to search for any such ads.

[6] Plaintiffs complain of Backpage's "limited production of ads from 2016," but Backpage's production of ads from 2016 was limited *only* by the number of ads placed using the account associated with the email address provided by Plaintiffs—nineteen ads. Backpage produced every ad posted using that account/email address, regardless of whether the person depicted in the ad appeared to be Jane Doe No. 3.

The administrative data for each of the sixteen ads relating to Jane Doe No. 3 showed that Backpage's systems and employees made no edits to the text of the ads, as the system tracks whether Backpage's systems or employees made any such changes.[7]   Plaintiffs complain that Backpage did not respond to "requests that it explain whether it retains or destroys advertisements in the form they are originally submitted by users"—but Plaintiffs' interrogatories contained no such request and, in any event, the request is irrelevant because the administrative data for the sixteen ads demonstrates that Backpage did ***not*** modify the text of Jane Doe No. 3's ads.[8]   Moreover, Plaintiffs' objection is predicated on Backpage editing the text of the ads—but Plaintiffs have failed to identify any edits by Backpage to the text of the ads, much less any edits that could be actionable—like adding content to an ad.   The only modifications Backpage made to any of the ads was to "delete" certain images that violated Backpage's Terms of Use relating to nudity—and, although those "deleted" images did not display on the website, Backpage preserved the deleted images and produced them to Plaintiffs.[9]

---

[7]  Backpage does not track whether users edit their ads.

[8]  Plaintiffs question the accuracy of the administrative data, noting that Backpage "deleted" images for violating its Terms of Use and that neither the "Inappropriate Content" or "Violated Terms of Use" boxes were checked—but Plaintiffs simply speculate inaccurately about the administrative data.  The "Inappropriate Content" or "Violated Terms of Use" boxes would be checked only if a *user* of the website reported that an ad had inappropriate content or failed to comply with the Terms of Use, not if a Backpage moderator "deleted" an image because it violated the Terms of Use.

[9]  The sixteen ads relating to Jane Doe No. 3 included fifty-nine images.  Fifty-two of the images did not include a head or face; three of the images included a chin and part of a mouth; three of the images included a chin, mouth, and part of a nose; and just one image showed a full face.  Backpage "deleted" the image with the full face and all the images with the chin, mouth, and part of a nose for violating nudity guidelines.  Plaintiffs claim that "any reasonable person" could determine that Jane Doe No. 3 was under the age of eighteen based on "partial facial" images showing just her chin and mouth, or her chin, mouth, and nose, but that claim is absurd.  Even the one image showing the entirety of Jane Doe No. 3's face (allegedly taken when she was seventeen) does not suggest she is under the age of eighteen.  In any event, Plaintiffs' suggestion that Jane Doe No. 3 can base a claim on the suppression of images violating the site's rules

In addition to requesting that Backpage search for ads relating to Jane Doe No. 3 using the email address and phone numbers Plaintiffs identified, Plaintiffs also asked Backpage to produce all ads containing two terms Jane Doe No. 3 and her trafficker used in conjunction with ads (respectively, the "First Identified Term," and the "Second Identified Term," collectively, the "Identified Terms") posted in various locales in Massachusetts or Florida from January 1, 2014 through the date of filing of the Complaint. Those words were used in some of the ads relating to Jane Doe No. 3. These requests were not targeted at the redrafting allegations, or even at ads relating to Jane Doe No. 3, but were part of an overly broad dragnet to locate other ads that might relate to Jane Doe No. 3. Nonetheless, Backpage searched for and identified more than 5,000 ads containing at least one of the Identified Terms in Massachusetts and Florida during the relevant period. Backpage then filtered the more than 5,000 ads for partial matches to the two telephone numbers Plaintiffs identified, and the four other telephone numbers that Backpage found in the nineteen ads Backpage located (none of the 5,000+ ads were linked to the email address). [10] Defendants' counsel then manually reviewed the resulting ads to identify any other ads that might have pertained to Jane Doe No. 3—but found none. [11]

---

regarding nudity, or on the cropping of images, fails as a matter of law. Moreover, Plaintiffs' assertion that there were ads relating to Jane Doe No. 3 on Backpage in 2014 and 2015, their further speculation that those ads had images showing Jane Doe No. 3's face, and their unsupported claim that Backpage might have removed those images, fall far short of what would be required to sustain a claim (or to meet the requirements of Fed. R. Civ. P. 11).

[10] Plaintiffs falsely complain that Backpage "refused to search for or produce" ads containing the Identified Terms. Backpage searched for and identified more than five thousand ads containing those terms, and counsel made reasonable efforts to identify any ads that might have pertained to Jane Doe No. 3 among those ads. Counsel first reviewed each ad with a partial telephone number match to see if the partial match could be linked to any of the six telephone numbers; none did. Counsel also reviewed each ad with a partial telephone number match for any ad that might relate to Jane Doe No. 3. There were just five such ads with the Second Identified Term. Four had images that clearly were not Jane Doe No. 3. The fifth was posted after Jane Doe No. 3 filed her complaint.

Responding to Defendants' document requests, Plaintiffs produced 1,428 pages of documents, but just fifteen of those pages related to Jane Doe No. 3.  Plaintiffs produced no documents relating to any ads Backpage had not already produced.  None of the fifteen pages pertained to Plaintiffs' allegations about the purported redrafting of ads related to Jane Doe No. 3.  Rather, one page was a copy of one of the sixteen ads Backpage had already produced and the remaining fourteen pages were copies of emails relating to the posting or expiration of ads Backpage had already produced.  Importantly, none of the documents Plaintiffs produced supported Plaintiffs' allegations that "Backpage … redrafted the advertisement [submitted to Backpage regarding Jane Doe No. 3] to suggest Jane Doe No. 3 was an adult."  (Order, Dkt. 44, at 2).  Otherwise, all of Plaintiffs production was a copy of the Permanent Subcommittee on

---

There were nearly 200 such ads with the First Identified Term—a common term in adult-oriented ads (so the presence of the term provides no reason to believe an ad related to Jane Doe No. 3).  Most of the ads containing the First Identified Term clearly did not relate to Jane Doe No. 3, as the images showed people who could not possibly have been Jane Doe No. 3 (e.g., men, much older women, white women, petite Asian women, etc.).  For the few ads that could not be categorically excluded, counsel examined the images in each ad and found no ads that appeared as though they could possibly depict Jane Doe No. 3 (who, for example, would not have looked any more like a man, an older woman, a white woman, or an Asian woman in 2014 than she did in 2016).  There were a few ads with the First Identified Term that did not have images, mainly from 2016 and the second half of 2015—and those ads bore no resemblance to any of the sixteen ads relating to Jane Doe No. 3.

[11]  Plaintiffs' claim that Backpage refused to produce many "responsive" documents has no merit.  The Court's Order plainly did not authorize Plaintiffs to demand the production of thousands of ads unrelated to Jane Doe No. 3—just because they contained a common, non-limiting term.  Plaintiffs never responded to Backpage's offer in the Backpage Responses to "provide an exemplar of an advertisement from 2014 that does not depict Jane Doe No. 3, but does contain the [First Identified Term] provided the necessary steps are taken before the Court to allow Backpage to disclose those contents of communications of customers pursuant to the Stored Communications Act."  In their March 8, 2018, letter, Plaintiffs posed two questions about Backpage's search for and review of ads with the First Identified Term in them:  (1) "Did Backpage search for documents from calendar years 2015 or 2016 that were associated with the [First Identified Term] in the [relevant] geographic areas?" and (2) "How did Backpage make the determination, as described in its Response, that certain advertisements from calendar year 2014 that were associated with the [First Identified Term] depict someone other than Jane Doe No. 3?"  Backpage responded at length to the questions in its letter of March 12, 2018 (copy attached).

Investigations Report and its attachments, and other materials unrelated to Jane Doe No. 3 or this litigation.

Responding to Defendants' interrogatories, Plaintiffs admitted that Jane Doe No. 3 wrote all or part of eleven of the sixteen ads Backpage produced related to Jane Doe No. 3. Nonetheless, Plaintiffs were unable to identify *any* modifications Backpage made to the text of *any* of the ads relating to Jane Doe No. 3, nor could they identify *any* content Backpage added to *any* ad.  Rather, Plaintiffs pointed to claims made by third parties that Backpage edited many ads on Backpage.com and, therefore, claimed Backpage might have edited Jane Doe No. 3's ads. Putting aside Plaintiffs' attempt to rely on hearsay within hearsay about what Backpage might have done when moderating ads unrelated to Jane Doe No. 3, the hearsay materials to which Plaintiffs referred all discuss Backpage's purported *deletion* of content from ads—not the *addition* of content to ads.[12]

Plaintiffs' Complaint does not allege that Backpage edited any images of Jane Doe No. 3. On the last day of the discovery period, however, Plaintiffs served supplemental responses to Defendants' interrogatories asserting for the first time Jane Doe No. 3's "belief" that Backpage cropped her face from photos in several ads.  As Plaintiffs raised this claim for the first time on the last day of the discovery period, Backpage was unable to explore the claim through

---

[12]  Not only does the PSI Report make clear that the moderation practices it criticized involved only the deletion of material from ads, the Report also acknowledges that Backpage discontinued those practices long before the ads related to Jane Doe No. 3 were posted in 2016. Staff Report, Senate Permanent Subcommittee on Investigations, January 10, 2017, p. 2 ("Manual editing entailed the *deletion of language* similar to the words and phrases that the Strip Term From Ad filter *automatically deleted*—including terms indicative of criminality.  * * * * It is unclear whether and to what extent Backpage still uses the Strip Term From Ad filter, but internal company emails indicate that the company used the filter to some extent as of April 25, 2014.  Manual editing appears to have largely ended in late 2012.") (emphasis supplied).

discovery, but, even if the allegation was true (and it's not), cropping an image posted by a third-party does not add to the content provided by the person posting the ad.[13]

In short, neither Plaintiffs nor Defendants located any advertisements pertaining to Jane Doe No. 3 posted in 2014 or 2015.  Using search terms provided by Plaintiffs, Backpage located and produced sixteen ads published in 2016 (and related administrative data) pertaining to Jane Doe No. 3.  Each of those sixteen ads ran just as posted by third-party users to Backpage.com, the only exceptions being that Backpage "deleted" images from eleven ads because of violations of its Terms of Use relating to nudity.  None of the sixteen ads suggested the subject of the ad was a minor, much less "plainly communicated" she "was a child."  To the contrary, each ad listed an age of 19 or older (and only one of the sixteen ads had an image showing more than a small part of a face).  Backpage's records show it made no edits to the text of any of the sixteen ads and Plaintiffs' responses to Backpage's discovery make clear that Plaintiffs have no facts to support their allegation that Defendants or Backpage added any content to any of the sixteen advertisements (including, but not limited to, content suggesting that Jane Doe No. 3 was an adult).[14]

---

[13]   However, Backpage knows its moderators did not crop the images of Jane Doe No. 3 to exclude her face, because the Backpage.com systems do not include a feature permitting moderators (or users, for that matter) to crop images posted by users.  Moreover, in Plaintiffs' Supplemental Responses, Jane Doe No. 3 admits that a) she did not post the photos for any of her ads, b) the non-sexually explicit images taken for her ads excluded her face, and c) she did not see any ads with sexually explicit images (*i.e*. eleven of the sixteen ads) until Backpage produced them last month.  If Jane Doe No. 3 did not put the images in the ads and did not see the ads until Backpage produced them last month, she can have no basis to "believe" that Backpage cropped those ads (rather than her trafficker or whomever provided the images).

[14]   Although Plaintiffs claimed in the Complaint that Jane Doe No. 3's trafficker paid for the ads so they would repost at the top of the search page, Backpage's records also show that each of the sixteen of the ads relating to Jane Doe No. 3 was a free ad.

Plaintiffs seek leave to file an amended complaint—but their responses to Defendants' interrogatories and requests for the production of documents demonstrate that Plaintiffs have no facts to support the conclusory allegation in the pending complaint that Backpage added content to ads relating to Jane Doe No. 3 and have no facts to support whatever new allegations regarding the addition of content to ads that they might include in an amended complaint.

## IV.    PROCEDURAL CONSIDERATIONS

If the Court deems further briefing necessary to resolve the Motion to Dismiss as result of this Report, the parties request any supplemental briefing be focused on the discovery pertaining to Jane Doe No. 3.  In the event the Court deems such briefing necessary, the parties request (1) that Defendants be permitted to file a supplement to their Motion to Dismiss of no more than 10 pages, (2) that Plaintiffs be permitted to file a supplemental opposition limited to 10 pages, and (3) that Defendants be permitted to file a reply limited to 5 pages.  Defendants further request that dates for these submissions be set by the Court at a telephonic status conference based on this Joint Status Report.

Respectfully submitted,

JANE DOE NO. 1, JANE DOE NO. 2,
and JANE DOE NO. 3
 _/s/ John T. Montgomery_____
John T. Montgomery (BBO #352220)
Aaron M. Katz (BBO #662457)
Christine Ezzell Singer (BBO #681525)
Jessica L. Soto (BBO #683145)
Matthew D. LaBrie (BBO #693698)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
T: (617) 951-7000
Email: john.montgomery@ropesgray.com
        aaron.katz@ropesgray.com
        christine.singer@ropesgray.com
        jessica.soto@ropesgray.com
        matthew.labrie@ropesgray.com

BACKPAGE.COM, LLC, CARL FERRER, MICHAEL LACEY, and JAMES LARKIN

By their attorneys,
*/s/ Robert Corn-Revere*
Robert Corn-Revere (*pro hac vice*)
*bobcornrevere@dwt.com*
Ronald G. London (*pro hac vice*)
*ronnielondon@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC  20006
Tel: (202) 973-4225

James C. Grant (*pro hac vice*)
*jimgrant@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA  98101
Telephone:  (206) 622-3150

Robert A. Bertsche (BBO #554333)
*rbertsche@princelobel.com*
Jeffrey J. Pyle (BBO #647438)
*jpyle@princelobel.com*
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA  02110
Tel:  (617) 456-8018

Dated:  March 26, 2018



1919 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20006-3401

**Robert Corn-Revere**
202.973.4225 tel
202.973.4499 fax

bobcornrevere@dwt.com

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

March 12, 2018

*VIA ELECTRONIC AND FIRST CLASS MAIL*
**john.montgomery@ropesgray.com**

John T. Montgomery, Esq.
Ropes & Gray
800 Boylston Street
Boston, Massachusetts 02199

Re:     *Doe No. 1, et al. v. Backpage, LLC, et al.*, No. 11:17-cv-11069 (D. Mass.)

Counsel,

This responds to your two letters dated March 8, 2018, which primarily ask questions about Defendant Backpage.com, LLC's ("Backpage") Answers and Responses to your First Request for Production of Documents ("Request"), pertaining to the changes, if any, made by Defendants or their agents in the course of posting ads describing or referring to Jane Doe No. 3.

First, regarding your letter inquiring about Backpage's response to your Supplemental Discovery Request No. 1, Backpage's Answers and Responses and related production of documents incorporated the additional search terms and locations the Supplemental Request added. Consequently, rather than being overdue, as your letter suggests, the answers and documents responsive to the Supplement were actually tendered well ahead of deadline.

Second, although your Complaint alleged traffickers placed ads relating to Doe No. 3 "in and around 2014," and that this occurred "[o]ver the course of several months," Complaint ¶¶ 75-76, Backpage, without waiving its objections to the overly broad search parameters of Plaintiffs' Request, provided all documents that arguably related to Doe No. 3 in any way. This search produced no documents supporting allegations that ads involving Doe No. 3 appeared on Backpage.com in 2014 or 2015. And as to the documents that were located and produced for ads that arguably relate to Doe No. 3 that were placed on Backpage.com in 2016, none support the allegations in the Com-

John T. Montgomery, Esq.
March 12, 2018
Page 2

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

plaint that Backpage or any of its personnel modified, altered, or deleted any text provided by Doe No. 3 or any trafficker.  The search, using the terms you provided, resulted in production of nineteen ads and associated administrative data.  Of these, the only changes made were the "deletion" of images that violated Backpage.com's Terms of Service in eleven of the ads.

These matters resolved, the following responds specifically to the questions raised in your other letter of March 8, under the enumerated headings utilized therein.

**1. Response to Request for Production No. 1**

You asked if Backpage possesses documents responsive to Plaintiffs' Request for Production No. 1 involving ads featuring Jane Doe No. 3 as submitted before moderation, whether, if no such documents currently exist, any were in Backpage's possession at any time, and in the latter case, why they are no longer so.  As with other questions in your letter (as discussed in more detail below), the issue here is the disconnect between expectations regarding moderation, and the fact that none of the ads pertaining to Jane Doe No. 3 were modified by Backpage processes or personnel, other than to suppress images that violated the terms of service.  Further, notwithstanding the allegations in the Complaint, all of the ads Backpage located pertaining to Jane Doe No. 3 were posted in 2016.  These key points provide important context for your question.

Regarding pre- and post-moderation versions of ads pertaining to Jane Doe No. 3, if a user submits an ad to Backpage.com containing images that violate the terms of service, Backpage may "delete" the image from the ad as displayed on Backpage.com.  This "deletion" suppresses display of the image on Backpage.com, but the images are not deleted from the database, and remain available to Backpage.  Eleven of the ads associated with the email address ███████████████ contained images that violated the terms of service, and those images were suppressed from the ads as displayed on Backpage.com.  However, those images were included in documents produced in response to Request Nos. 1 and 2, and appear below the "Administrative Data" area beneath the text "Deleted Images (administrators only)."  *See*, *e.g.,* BP-MA-JD#3-000014 - BP-MA-JD#3-000015 and BP-MA-JD#3-000020.  Thus, examination of those documents reveal *both* what they looked like "before moderation," *i.e.*, the images denoted as deleted were part of the original posting, and how they appeared as displayed on Backpage.com.

John T. Montgomery, Esq.                    CONFIDENTIAL – SUBJECT
March 12, 2018                                 TO PROTECTIVE ORDER
Page 3

With respect to any other modifications that may have been anticipated, Backpage.com
tracked whether any Backpage processes or personnel modified an ad in any respect.  In
addition to tracking the suppression of images, as discussed above, the system tracked
any other modifications to an ad by any Backpage processes or personnel.  At the top of
each "object editor" page, the system sets forth the date and time each ad posted, and
the date and time of any modifications by Backpage personnel.  *See*, *e.g.*, BP-MA-JD#3-
000002 and BP-MA-JD#3-000007.  If the "Originally posted" date and time on the "object
editor" page is the same as the "Last modified" date and time – as is the case with all
ads produced in response to this Document Request – the ad ran as posted by the user
with no modifications by any Backpage personnel (the only exception being if images
were suppressed, which was tracked separately).  In addition, if an automated filtering
process had modified the text of any of those advertisements, the "Strip Term From
Ad" check box would be marked in the "Violations" section of the "object editor" data,
which the documents produced reflect is not the case.

**2. Response to Requests for Production Nos. 1 and 2**

You asked whether Backpage searched for documents from 2015 associated with
the email address ▮▮▮▮▮▮▮▮▮▮ and/or the telephone number ▮▮▮▮▮▮.
As noted above, the answer is "yes."  Notwithstanding the more limited time frame
covered by the allegations in the Complaint, Backpage searched the pertinent data-
bases for the years 2014-2017 for any ads associated with the designated email address,
▮▮▮▮▮▮▮▮▮▮, and for any ads with telephone number ▮▮▮▮▮▮, and
produced the ads associated with that email address.  Backpage found no ads with
the telephone number ▮▮▮▮▮▮.  Moreover, the "Administrative Data" for each ad
states that the user account associated with the email address ▮▮▮▮▮▮▮
was created in March 2016.  Therefore, there could be no ads associated with that user
account in 2014 or 2015, as the account did not exist in 2014 or 2015.

You also asked whether Backpage searched for documents from 2015 or 2016 associated
with the term ▮▮▮▮ in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ geographic areas.  Again, the answer is
"yes."  Backpage searched the pertinent databases for documents from 2014-2017 for
any ads with the term ▮▮▮▮  That search returned over 2,500 responses, as ▮▮▮ is
a term commonly found in ads.  In an effort to locate any ads with ▮▮▮ that might
relate to Jane Doe No. 3 (in addition to the eleven ads Backpage produced that were
associated with the email address ▮▮▮▮▮▮▮▮▮ and that contained the term

John T. Montgomery, Esq.                        CONFIDENTIAL – SUBJECT
March 12, 2018                                    TO PROTECTIVE ORDER
Page 4

███████ Backpage searched for all ads in the pertinent databases containing both the
term ███████ and *any* *partial* match to either one of the two phone numbers identified in
your discovery requests, specifically, ███████████ and ███████████, or to any one of
the four additional phone numbers that Backpage identified as associated with the
email address ███████████████████ (notwithstanding that they were not provided in
your discovery requests), ███████████, ███████████, ███████████, and ███████████.
And while Backpage did not search for partial matches based on area code, it searched
for ads that contained ███████ and any one of the following numerical strings: ███, ███,
███, ███, ███, ███, ███, ███, ███, ███, ███, ███.

Counsel then reviewed each of these ads to ascertain whether any of those partial string
matches tied to one of the six phone numbers associated with ██████████████████;
none did.  Counsel also reviewed each ad to ascertain whether any of the ads appeared
to relate to Jane Doe No. 3.  Most clearly did not (for example, ads with images of men,
of blonde white women, of heavyset white women, of petite Asian women, of heavyset
black women, ads posted after the complaint was filed, etc.).  Counsel compared the
other ads with the apparent images of Jane Doe No. 3 and none appear to relate to her,
in that (in addition to phone numbers not matching) the ads are not similar, the images
do not appear to be her, etc.  The same process was followed with respect ads with the
term ███████ with the same result.  (The foregoing also answers your question about
how Backpage made the determination described in its Response that certain ads from
2014 associated with the term ███████ depict someone other than Jane Doe No. 3.)

You also asked if Backpage conducted any search for documents associated with an
individual known as ███████  Backpage did so, and found no such records.

You asked whether Backpage withheld any identified document(s) that are potentially
responsive to Plaintiffs' Requests for Production No. 1 or No. 2 on the basis of its objec-
tions to those Requests.  The answer, based on the above explaining how Backpage en-
deavored to determine what ads, if any, might have described or referred to Jane Doe
No. 3, is "no," Backpage produced all that it found.  Backpage did not produce ads
that it found that are *not* responsive to Requests for Production Nos. 1 and 2, in that it
withheld ads including ███████ or ███████ that were not associated with email address
████████████████████, or with one of the following telephone numbers associated with
the email address ███████████████████: ███████████, ███████████, ███████████,
███████████, ███████████, or ███████████.

John T. Montgomery, Esq.                                CONFIDENTIAL – SUBJECT
March 12, 2018                                                    TO PROTECTIVE ORDER
Page 5

In response to your questions why Backpage's method of searching for documents
ostensibly failed to identify the ad referred to in document JANEDOES00000006, and
whether Backpage possesses a copy of the that ad in a form "as submitted to Backpage
and before undergoing any Moderation," Backpage both identified and produced
the ad referred to in document JANEDOES00000006 (which is the same as that in
JANEDOES00000008).  Those documents reference the ad with Post ID 34772726 (which
number appears in the middle of the link to the ad), which Backpage produced as BP-
MA-JD#3-000043 - BP-MA-JD#3-000047.  The user modified this ad after it originally
posted.  The foregoing, along with the explanation above regarding how posts are pro-
cessed and kept by Backpage's system, also answers your question whether Backpage
possesses a copy of the ad in question "after undergoing any Moderation."

Finally, you asked whether Backpage possesses facial recognition software and, if so,
whether the search for ads or other responsive documents concerning Jane Doe No. 3
included the use of such software.  Backpage does not have facial recognition software.

**3. Response to Request for Production No. 4**

You asked if Backpage conducted any search for documents responsive to Request for
Production No. 4 other than the search of archived ads used to produce Backpage's
responses to Requests for Production Nos. 1 and 2.  No such search was necessary.  If
any Backpage processes or personnel had made any changes to the ads related to Jane
Doe No. 3, those modifications would be reflected in the documents produced in
response to Requests for Production Nos. 1 and 2.  Those documents confirm that no
Backpage processes or personnel made any changes to the ads other than to suppress
images that violated the terms of service, as indicated in Backpage's document produc-
tion (BP-MA-JD#3-000001 - BP-MA-JD#3-000089).  In this connection, Backpage did not
withhold any document(s) potentially responsive to Request No. 4 on the basis of any
objections.

You also asked whether Backpage possess any documents that identify or record the
changes, if any, made by Backpage or its agents to the text of any ads relating to Jane
Doe No. 3 that appeared on Backpage.com during 2014, 2015, or 2016, and if so, if Back-
page would identify and provide exemplars of such documents.  Again, the answer is
"no."  Backpage made no modifications to the text of any of the ads relating to Jane
Doe No. 3.  If any Backpage personnel had modified the text of one of those ads, the
"Originally posted" date and time on the "object editor" page would not be the same

John T. Montgomery, Esq.

CONFIDENTIAL – SUBJECT

March 12, 2018

TO PROTECTIVE ORDER

Page 6

as the "Last modified" date and time, unlike what is reflected in the documents pro-
duced.  If an automated filtering process had modified the text of any of those adver-
tisements, the "Strip Term From Ad" check box would be marked in the "Violations"
section of the "object editor" data, which the documents produced reflect is not the case.

### 4. General Objection No. 11 to Requests for Production, and Associated Specific Objections

You asked, in essence, whether Backpage searched for documents outside 2014, and if
so, in response to which, if any, Requests for Production.  As indicated in the document
request responses, and above, Backpage searched for documents dated outside 2014
with respect to _all_ requests (in addition to 2014)—and produced 19 ads and their related
administrative data from 2016.  Connected to this, you asked for a description of the
searches conducted, which categories or sources of documents were searched, and the
years the search covered, if any other than 2014 was searched.  Backpage's searches
were conducted in a manner that would have – and did – identify any responsive
documents in 2015, 2016, and 2017 (at least through the date of filing of the complaint).
Backpage did not withhold any identified document(s) potentially responsive to any
of Plaintiffs' Requests for Production on the basis that such document(s) was dated
outside 2014.

If there are further questions, please do not hesitate to contact us.

Sincerely,

DAVIS WRIGHT TREMAINE LLP

Robert Corn-Revere

cc:   James C. Grant
        Ronald G. London
        Jeffrey J. Pyle
        Robert A. Bertsche

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

*/s/ Robert Corn-Revere*
Robert Corn-Revere