## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANE DOE NO. 1, JANE DOE NO. 2, and JANE DOE NO. 3, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| BACKPAGE.COM, LLC, CARL FERRER, MICHAEL LACEY, and JAMES LARKIN, | ) ) ) |
| Defendants. | ) ) ) ) |

Docket No. 17-cv-11069-LTS

**FIRST AMENDED COMPLAINT**

## <u>INTRODUCTION</u>

1. This is an action under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1595, and Massachusetts General Laws, Chapter 93A against Backpage.com, LLC and its principals ("Backpage") for aiding, supporting, and facilitating the sexual exploitation of Plaintiffs Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3. Backpage is a criminal enterprise that owns and operates a global online marketplace that derives its revenue principally from illegal commercial sex, including sex with children. Defendants operate Backpage.com, a website, as well as other affiliated websites, that were intentionally designed to attract advertisements for illegal commercial sex, and that have succeeded in attracting more than 80 percent of the market for such advertising nationally.

2. For years, Defendants have aggressively maintained to the public, law enforcement, and the courts that Backpage.com is a neutral forum that has attracted adult content, and that it is a mere publisher that cannot be held responsible for any illegal conduct occurring on the website. Indeed, the First Circuit upheld the dismissal of an action against Backpage under

Rule 12(b)(6) on the ground, *inter alia,* that Backpage was not responsible for injuries to children trafficked on its website simply because its conduct as a publisher "ma[d]e sex trafficking easier." *Doe v. Backpage.com,* 817 F.3d 12, 16 (1st Cir. 2016).

3.     However, in January 2017, the U.S. Senate Permanent Subcommittee on Investigations ("Senate Subcommittee") issued a fifty-three page report that details Backpage's active participation in the illegal commercial sex business occurring on the website. *Backpage.com's Knowing Facilitation of Online Sex Trafficking* ("*2017 Senate Report*") (2017) (Ex. A).  After conducting a 20-month investigation into Backpage and its practices and reviewing over one million pages of documents, the Senate Subcommittee concluded, *inter alia*, that Backpage knowingly "facilitates prostitution and child sex trafficking" by various means described in the report.  Among its most pernicious practices, Backpage systematically employs both electronic and manual means to alter language proposing illegal sexual transactions and to remove images to "sanitize" the advertisements so that they appear to involve adults rather than children.  *2017 Senate Report* at 2, 3, 16–17 (Ex. A).  The practice of modifying advertisements, along with other conduct detailed in the Senate Report, was intended to minimize the risk of law enforcement detection of sex trafficking of minors, and thus to grow the advertising volume, market share, and profitability of Backpage.com.  The Senate Report detailing Backpage's conduct was supported by 839 pages of internal Backpage communications, corporate financial documents, and company policies and guidelines regarding its operations. *Appendix of 2017 Senate Report* ("*Senate Appendix*").

4.     In March 2018, Congress passed the "Allow States and Victims to Fight Online Sex Trafficking Act of 2017" ("FOSTA"), and the President signed it into law on April 11, 2018.  Pub. L. No. 115-___, ___ Stat. ___ (2018) (codified at, *inter alia*, 47 U.S.C. § 230).  FOSTA

specifically states, among its legislative findings, that Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, "was never intended to provide legal protection to websites that . . . facilitate traffickers in advertising the sale of unlawful sex with sex trafficking victims," and that "websites that promote and facilitate prostitution have been reckless in allowing the sale of sex trafficking victims and have done nothing to prevent the trafficking of children and victims of force, fraud, and coercion." FOSTA § 2(1)-(2). Accordingly, Congress passed FOSTA to "clarify that section 230 of [the CDA] does not prohibit the enforcement against providers and users of interactive computer services of *Federal* and State criminal and *civil law* relating to sexual exploitation or sex trafficking." *Id.* pmbl. (emphasis added). FOSTA amended, *inter alia*, Section 230(e) of the CDA to provide that "[n]othing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit . . . any claim in a civil action brought under section 1595 of title 18, United States Code, if the conduct underlying the claim constitutes a violation of section 1591 of that title." *Id.* § 4(a). FOSTA also provides that its amendment to Section 230(e) "shall apply regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after [FOSTA's] date of enactment." *Id.* § 4(b). The effect of FOSTA is to ensure that website operators like Backpage can be held civilly liable to their victims for their violations of federal criminal law.

5.     In the cases of Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3, Backpage knew or had reason to know that the subjects of the advertisements were children at the time they were advertised for sale on Backpage.com and its affiliated websites. Yet Backpage intentionally facilitated the sale of Plaintiffs for illegal sex by, among other things, altering the content of the advertisements offering them for sale to convey the false impression that Plaintiffs were adults.

As a result of Backpage's conduct, the duration and frequency of the exploitation of these children was substantially increased.

6.     Plaintiffs therefore bring claims under 18 U.S.C. § 1595, alleging that Defendants knowingly benefited from participation in ventures that they knew or should have known violated 18 U.S.C. § 1591, which prohibits participation in the trafficking of minors for commercial sex. Plaintiffs also bring claims under Massachusetts General Laws chapter 93A, alleging that, by doctoring advertisements for illegal commercial sex concerning each Plaintiff to convey the false impression that the proposed transactions involved adults rather than children, Defendants engaged in unfair or deceptive acts or practices, which extended the time period during which Plaintiffs were exploited and thus the number of instances in which each of them was raped.

## PARTIES

7.     Plaintiff Jane Doe No. 1, who is currently 18 years old, was 15 years old when she was first sold for sex in Massachusetts, New York, Connecticut, New Hampshire and Maine through Backpage.com.  She resides in Massachusetts.

8.     Plaintiff Jane Doe No. 2, who is currently 18 years old, was 14 years old when she was first sold for sex in Massachusetts and Connecticut through Backpage.com.  She resides in Rhode Island.

9.     Plaintiff Jane Doe No. 3, who is currently 18 years old, was approximately 15 years old when she was first sold for sex in Massachusetts and Florida through various means, including Backpage.com.  She resides in Massachusetts.

10.     Defendant Backpage.com, LLC is a Delaware limited liability company with a principal place of business in Dallas, Texas. Backpage.com LLC does business as Backpage.com, EvilEmpire.com, and BigCity.com and owns, operates, designs, and controls the websites Backpage.com, EvilEmpire.com, and BigCity.com. At all times material hereto, Defendant

Backpage.com, LLC transacted business in Massachusetts through its Backpage.com, EvilEmpire.com, and BigCity.com websites.

11.     Defendant Carl Ferrer is the CEO of Backpage.com, LLC. At all times material hereto, Defendant Ferrer transacted business in Massachusetts, including through Backpage.com, EvilEmpire.com, and BigCity.com.

12.     Defendant Michael Lacey is an owner of Backpage.com, LLC. At all times material hereto, Defendant Lacey transacted business in Massachusetts, including through Backpage.com, EvilEmpire.com, and BigCity.com.

13.     Defendant James Larkin is an owner of Backpage.com, LLC. At all times material hereto, Defendant Larkin transacted business in Massachusetts, including through Backpage.com, EvilEmpire.com, and BigCity.com.

## JURISDICTION & VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367, as well as § 1332 (with an amount in controversy that exceeds $75,000).

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 1400(a).

## FACTS COMMON TO ALL COUNTS

**A.     Backpage.com is the world's largest and most profitable online marketplace for illegal sex trafficking.**

16.     Backpage is the "market leader" in online commercial sex advertising. *2017 Senate Report* at 6 (Ex. A).  Over the past decade or more, marketing for prostitution has migrated to the Internet, as website operators have sought to enable buyers and sellers of sex to maintain their anonymity and minimize the risk of detection by law enforcement.  Named for the infamous "Back Page" of the Village Voice newspaper, Backpage.com has become the primary destination for buying and selling illegal commercial sex online, accounting for 80 percent or more of all

revenue from online commercial sex advertising in the United States.  *Id.* at 6 (Ex. A).  Virtually all of Backpage's net revenue—more than 99 percent—is directly attributable to advertisements appearing in its "Adult" category," and its net profit in 2015 alone was estimated at $135 million; Backpage.com and its affiliates have been valued at more than $600 million.  Press Release, *Attorney General Kamala D. Harris Announces Criminal Charges Against Senior Corporate Officers of Backpage.com for Profiting from Prostitution and Arrest of Carl Ferrer, CEO*, State of California Department of Justice Office of the Attorney General (Oct. 6, 2016), available at https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior; *2017 Senate Report* at 43, 45 (Ex. A).

17.     As of January 2017, Backpage operates in 97 countries and 943 geographic locations across six continents globally.  *Id.* at 45 (Ex. A).  In Massachusetts, Backpage.com lists ads in seven geographic locations.

18.     Backpage.com, at all material times,[1] included an advertisement category conspicuously labeled "Adult Entertainment."  The "Adult Entertainment" category contains a number of subcategories, including one labeled "Escorts."  Although Backpage.com allows individuals to post free classified advertisements for lawful consumer products such as used bicycles and furniture in many different categories across the website, the focus of its business always has been the unlawful commercial sex industry: the advertisements in the "Adult Entertainment" category are the only ones for which Backpage charged a fee to make a posting,

---

[1] On January 9, 2017, hours before the U.S. Senate convened its hearing, Backpage announced the shutdown of its Adult Entertainment section.  This change was a sham; the majority of advertisements for illegal commercial sex formerly posted under the Adult Entertainment section simply moved to the Dating section.  In any event, throughout the time period material in this litigation, Backpage.com's Adult Entertainment section was fully operational.

and advertisements for illegal commercial sex, such as sex with children, are routinely posted in this category.

19.     At all material times, the charge to place an advertisement in the "Escorts" section was $12.00 in most geographic areas, including Boston and the surrounding metropolitan region, though Backpage.com charged up to $17.00 per advertisement in some areas of New York City. Backpage.com also offered to repost advertisements for an additional charge.  In Massachusetts, for example, four reposts cost $48.00, eight reposts cost $96.00, twelve reposts cost $144.00, and twenty-six reposts cost $288.00.

**B.     Backpage knowingly participates in child sex trafficking.**

20.     It is estimated that tens of thousands of children are trafficked for sex on Backpage.com annually in the United States. The average age of first exploitation for these children is only 15 years old.

21.     Backpage.com is the preferred avenue for traffickers to advertise children for sale for illegal sex in the United States.  According to reports from the National Center for Missing and Exploited Children (NCMEC), the leading nonprofit organization in the United States working with law enforcement to combat sex trafficking of children, "73% of the suspected child trafficking reports it receives from the public involve Backpage." *2017 Senate Report* at 6 (Ex. A).   Though the Defendants may dispute the frequency with which Backpage.com advertisements involve children, Defendants are well aware that ads for minors have appeared frequently on Backpage.com.  Indeed, the persistent use of Backpage.com to traffic children has been communicated to Defendants by numerous law enforcement agencies, including the state attorneys general of all 50 states and by NCMEC.

22.     In April 2015, the Senate Subcommittee began to investigate Backpage. *Id.* at 10 (Ex. A). Following an interview with Backpage's general counsel Elizabeth McDougall, in which

McDougall refused to answer relevant questions about Backpage's business practices, in August 2015, the Senate Subcommittee issued subpoenas for the depositions of two Backpage employees. *Id.* at 10–11 (Ex. A).  The two employees retained individual counsel and declined to testify, invoking their Fifth Amendment privilege against self-incrimination.  *Id.* at 11 (Ex. A).  An October 2015 subpoena to Backpage requested documents related to, among other topics, Backpage's (i) review of proposed advertisements, including information related to any altering or modifying of advertisements before publication, (ii) document retention and data policies, (iii) basic corporate information, and (iv) revenue derived from adult advertisements.  *Id.* at 10 (Ex. A).  Backpage refused to comply with the subpoena beyond production of a small amount of largely irrelevant material.  *Id.* at 11 (Ex. A).  Subsequently, the Senate Subcommittee issued a subpoena to Defendant Ferrer, the CEO of Backpage.com, to appear and testify at a public hearing.

23.     On November 19, 2015, the Senate Subcommittee held its first hearing on Backpage's role in the trafficking of children on the Internet.  *Id.* at 12 (Ex. A).  Defendant Ferrer failed to appear for the hearing, purporting to invoke the Fifth Amendment privilege through counsel.  *Id.* at 12 (Ex. A).

24.     Following the failure of further efforts to secure compliance with the Senate Subcommittee's subpoena, on March 17, 2016, the Senate unanimously voted to adopt a resolution authorizing and directing Senate Legal Counsel to bring a civil action under 28 U.S.C. § 1365 to enforce the subpoena.  *Id.* at 12 (Ex. A).  This was the first civil contempt resolution adopted by the Senate against any person or entity in more than twenty years.  *Id.* at 1 (Ex. A). Thereafter, the Senate Subcommittee successfully overcame the efforts by Backpage to resist judicial enforcement of the subpoena through extensive litigation in the District Court for the

District of Columbia, the Court of Appeals for the D.C. Circuit, and the United States Supreme Court.  In the fall of 2016, Backpage eventually produced certain documents responsive to the subpoena, and the Senate Subcommittee deposed a number of current and former Backpage employees.

25.     The Senate Subcommittee's 20-month investigation into Backpage and its practices culminated in the *2017 Senate Report*, titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  After reviewing over one million pages of documents, the Senate Subcommittee concluded, *inter alia*, that "Backpage has knowingly concealed evidence of criminality by systematically editing its 'adult' ads," and that "Backpage knows that it facilitates prostitution and child sex trafficking."  *Id.* at 3, 16 (Ex. A).

26.     At a public hearing on January 10, 2017, the Defendants Ferrer, Lacey, and Larkin (as well as Backpage's general counsel, Ms. McDougall, and another senior executive) each invoked the Fifth Amendment in refusing to respond to any questions from the Senate Subcommittee regarding various aspects of their active support of sex trafficking of children on the website.  *See* Transcript of Senate Hearing 115–16 at 11–19, U.S. Senate Permanent Subcommittee on Investigations, Jan. 10, 2017 (Ex. B).[2]

27.     The evidence revealed by the Senate Report confirms that Backpage is a criminal enterprise whose entire business model fosters and depends upon the advertising and sale of human beings for illegal commercial sex.  The structure of the website and the efforts of its employees are devoted to attracting advertisements for illegal commercial sex and participating

---

[2] Defendants Ferrer, Lacey, and Larkin also invoked the Fifth Amendment in refusing to provide any information in response to Plaintiffs' discovery requests during limited discovery in this matter.  *See* Ex. C (Individual Defendants' Answers and Responses to Plaintiffs' First Request for the Production of Documents); Ex. D (Individual Defendants' Answers and Responses to Plaintiffs' First Set of Interrogatories to Defendants).

in various ways with the advertisers to facilitate the successful completion of the illegal transactions, including those involving paid sex with children.

**C.      Backpage knowingly makes material alterations to the content of advertisements for illegal commercial sex, including sex with children.**

28.      Backpage understands that its profitability depends on minimizing the level of law enforcement scrutiny of its advertisers, particularly those who are trafficking in children.  The underlying assumption by Defendants is that law enforcement will focus most of its scarce resources on clearly illegal advertisements of children and that minimal attention will be devoted to the more ambiguous arena of illegal commercial sex involving adults.  To accomplish its goals, therefore, Backpage developed a multi-tiered system of review or "moderation" of advertisements, as well as other practices, to "sanitize" advertisements that would tend to draw the attention of law enforcement personnel seeking to identify victims of child sex trafficking. The practices include Backpage's intentional and purposeful removal or obscuring of plain indications in proposed advertisements that a child is being offered for sale.

29.      According to Backpage's general counsel, Ms. McDougall, as of June 2015, Backpage employed a team of 120 moderators.  *U.S. Senate Recommendation to Enforce a Subpoena Issued to the CEO of Backpage.com LLC*, at 14 (2016) (Ex. E).  Although the mechanics of the moderation has changed over time—as detailed in the 2017 Report and as discussed below—at all relevant times Backpage has reviewed and altered the majority of the advertisements submitted to Backpage.com.  Indeed, Backpage prides itself on having moderators ***individually review every single advertisement*** submitted to the "adult" section.  *See* Supp. Decl. of Harry H. Schneider, Jr., Ex. 15, *J.S., et al. v. Village Voice Media Holdings LLC, et al.*, No. 12-2-11362-4, at 11:32-34 (Wash. Sup. Ct. May 17, 2017) (Ex. F).

30.     By Backpage's own estimates, it has altered the content of approximately 80 percent of the advertisements submitted to the "adult" section of its website.  *2017 Senate Report* at 2 (Ex. A).  Indeed, based on a limited production of documents by Backpage to the Plaintiffs in this action, Plaintiffs can confirm that Backpage deleted photographs from 50 percent of the produced advertisements that featured Plaintiff Jane Doe No. 3.

31.     Internal Backpage emails confirm that, as of August 2016, its moderators continued to manually alter the advertisements that users submitted.  *Id.* at 39 (Ex. A).  Backpage's limited production to Plaintiffs in this action confirms this information, as the produced documents reflect alterations to advertisements dated from May and June of 2016.

32.     These alterations often materially change the very nature of the advertisement's content by removing or obscuring any indicia that the advertisement involves a child.

33.     At all relevant times, when posting an advertisement in the "Escorts" section on Backpage.com, the user had to draft an advertisement using the posting interface on the website. The interface required that the advertiser first provide a title; the age of person advertised; a description, *i.e.*, the text of the advertisement; and the advertiser's email address. Backpage then offered the option of entering a location and contact information, and the opportunity to upload images and videos to include with the advertisement.

34.     After each proposed advertisement was entered in the space provided on the website, Defendants "filtered" the advertisement through a proprietary software program that reviewed the language to detect certain words that signaled that the transaction involved illegal sex.  The list of signals included words or phrases, such as "girl friend experience," "30 minutes," "quickie," "satisfaction guaranteed," "temporary girl friend," "VIP service," "willing to please," "you PAY 2 PLAY," and "no limits," which were codes for prostitution.  It also included terms

such as "young," "teen," "barely legal," "Lolita," "school girl," and "fresh," which were known in the marketplace to signal that a child was the subject of the proposed advertisement. *Senate Appendix* at 261–275 (Ex. G).  The automated filter was the primary repository of the terms that Backpage wished to ban from the website, and Defendants continually reviewed and expanded the list of banned terms, which eventually included thousands of words.  *Id.* at 143–144 (Ex. H), 314–315 (Ex. I).  When the automated filter detected a term included on the list of banned terms, the filter would delete it, but the proposed advertisement still would be posted in that revised form awaiting the next tier of review.

35.     The automated filtering process, known at all relevant times as the "Strip Term From Ad Filter," resulted in changes to the wording of—in the words of Defendant Ferrer— "almost every adult ad[vertisement]" posted on the website.  *2017 Senate Report* at 25 (Ex. A); *Senate Appendix* at 248 (Ex. J).  The Senate Subcommittee found that Defendants understood that some of the terms in the automatic filter signaled that a child was the subject of the proposed advertisement.  *2017 Senate Report* at 24 (Ex. A).  Indeed, Defendant Ferrer "personally directed or approved the addition of new words to the Strip Term From Ad Filter, and Backpage documents clearly show he understood their implications for child exploitation."  *Id.* at 24 (Ex. A).  For example, after adding the word "Lolita" to the list, Defendant Ferrer explained to a Backpage moderator that Backpage added "Lolita" to this list because it is widely recognized "code for under aged girl[s]."  *Senate Appendix* at 156 (Ex. K). As the Senate Subcommittee concluded, "the 'Strip Term From Ad' filter changed nothing about the true nature of the advertised transaction or the real age of the person being sold for sex."  *2017 Senate Report* at 2 (Ex. A).  Yet, "thanks to the filter," Backpage's adult category advertisements looked, in the words of Backpage employees, "cleaner than ever."  *Id.* at 2 (Ex. A).

36.     Following the completion of the automated filtering process, the newly posted (and usually already altered) advertisements were reviewed by a Backpage employee, known as a moderator.  *Id.* at 2 (Ex. A); *Senate Appendix* at 314–315 (Ex. I).  The role of the moderators, who were not aware that proposed advertisements had been through the automated filtering process, was to detect any remaining language in the advertisement that would signal a transaction for illegal commercial sex and to review any photographs that were posted with the advertisement.  *2017 Senate Report* at 33 (Ex. A).  When they learned that some moderators wholesale rejected (*i.e.*, pulled from the website) proposed advertisements that were blatantly illegal, Backpage executives sent a blast email to the entire moderator team instructing them to "stop Failing [*sic*] ads and begin Editing [*sic*]."  *Id.* at 28 (Ex. A).  In other words, Backpage executives directed moderators to increase altering the content of the advertisements to remove or obscure the indicia of illegality.

37.     Defendant Ferrer encouraged moderators "to be subjective [in their edits] and not cause too much damage" to Backpage's relationship with traffickers who regularly advertised on the site or to the business's revenue stream.  *Senate Appendix* at 96 (Ex. S).  Thus, moderators were instructed and expected to "edit ads for explicit sexual language [and] anything to do with [money]" in order to create the false appearance that the advertisements could be for legal transactions.  *Id.* at 1-3 (Ex. L).  Similarly, moderators were instructed to delete any terms indicating a child was involved that the filter did not detect, despite knowing that the advertisement was selling sex with a child.  For example, when an advertisement used the word "tean" (rather than the word "teen" contained in the filter program), Defendant Ferrer instructed the moderator to simply remove the word, rather than rejecting the advertisement altogether.  *Id.* at 305 (Ex. M).

38.     As to the photographs that accompanied a proposed advertisement, Backpage's moderators removed "images indicative of criminality, including child sex trafficking" from advertisements. *2017 Senate Report* at 1 (Ex. A).  Even if a photograph included the face of an individual who any reasonable person would recognize to be a minor, Backpage had a practice of deleting such photographs and allowing the modified advertisement to post on the website, instead of blocking the advertisement (and its poster) and alerting authorities.

39.     Moderators were instructed to delete pictures that appeared to the moderators to be children, and then to approve and post the ad.  *Senate Appendix* at 132 (Ex. N).  Indeed, even when a moderator noted that the same trafficker had submitted pictures of children two or three times, a Backpage senior executive instructed the moderator to simply delete the picture again and post the advertisement selling the child for sex.  *Id.* at 298 (Ex. O).

40.     However, Backpage soon realized that the practice of removing those photos could deter some of its users.  Indeed, Backpage instructed its moderators to remove child-sex advertisements and photographs only "IF YOU REALLY VERY SURE [*sic*] THE PERSON IS UNDERAGE. . . IF IN DOUBT ABOUT UNDERAGE : [*sic*] The process for now should be to accept the ad . . . ."  *Senate Appendix* at 358 (Ex. P) (emphasis in original).  Backpage directed its moderators not to modify ads with "just a few pics of up close genital[s]" but only those that contained "LEGIT nude/extreme images" that made the proposed ad clearly illegal.  *Id.* at 405 (Ex. Q) (emphasis in original).  Backpage warned its moderators after altering or removing text or images not to "abuse the lock ad feature—[or] users will probably email in" to complain.  *Id.*

41.     Documents produced by Backpage during limited discovery in this matter confirm that Backpage had a regular practice, through at least 2016, of deleting certain images from advertisements.  In the small subset of advertisements from 2016 produced by Backpage in this

action, Backpage deleted photographs from 50 percent of the produced advertisements relating to Jane Doe No. 3.  In 25 percent of the produced advertisements relating to Jane Doe No. 3, the photographs deleted by Backpage include portions of Jane Doe No. 3's face.

42.    Backpage has represented that explicit photographs are deleted from advertisements because they violate Backpage.com's "Terms of Use."   But Backpage's "administrative data" does not reliably record "Terms of Use" violations.  The "administrative data" for each advertisement contains a series of checkboxes that purport to indicate whether certain categories of moderation were conducted on that advertisement.  *See, e.g.*, Ex. R at BP-MA-JD#3-000047.  These include checkboxes for, *inter alia*, "Inappropriate Content," "Violated Terms of Use," and "Strip Term From Ad."   In Backpage's production of documents in this matter, several advertisements reflect that Backpage moderators deleted images that contain full frontal nudity.  *See, e.g.*, *id.* at BP-MA-JD#3-000044.  However, no advertisement with deleted images had either the "Inappropriate Content" or "Violated Terms of Use" checkbox selected. *See, e.g.*, *id.* at BP-MA-JD#3-000047.

43.    These inconsistencies demonstrate that Backpage did not reliably record the conduct of its moderation processes.  They likewise cast doubt on Backpage's assertion in this matter, through its counsel, that the absence of any selected "Strip Term From Ad" checkbox in the produced documents should be understood as confirmation that none of the produced advertisements were altered by the "Strip Term from Ad" filter.

44.    At the conclusion of this initial moderator review step in the moderation process, Backpage instructed moderators to "lock[]" the ad, preventing the user from making changes while it was "live" on Backpage.com.  *Senate Appendix* at 96–97 (Ex. S).

45.     After the automated filtering and initial moderator review was complete, a smaller senior team of moderators conducted yet another review of advertisements.  Defendant Ferrer regularly participated in this process.  This phase focused principally on the advertisements that the initial moderator had rejected outright because they so blatantly proposed illegal commercial sex or sex with a child and could not reasonably be modified to obscure that fact.  In many instances, the senior moderator overrode the judgment of the initial moderator, materially altered the rejected advertisement to obscure any indicia of illegality, and then posted it on the website.

46.     After the moderation process was complete, the original draft advertisement was deleted from Backpage's system, thus leaving no record of the original language drafted by the poster.  *Senate Appendix* at 141 (Ex. T).

47.     Documents produced by Backpage during limited discovery in this action confirm that Backpage did not retain copies of original, as-submitted advertisements and did not keep reliable records of changes to the text of advertisements, thereby obscuring the extent of Backpage's alterations to such advertisements.  Specifically, Plaintiff Jane Doe No. 3 produced an email from Backpage to an email address associated with Jane Doe No. 3, dated May 27, 2016, relating to an advertisement featuring Jane Doe No. 3 that was posted on Backpage.com (appended hereto as Exhibit U).   Backpage produced an advertisement with the same "Post ID" as the advertisement identified in this email, yet the title of the posted and produced advertisement (Ex. R) was *not* the same as the title of the advertisement in the email.[3]  Backpage claims that the modification to the title of the advertisement between submission and publication must have been made by the user, but the "administrative data" that Backpage produced with this advertisement

---

[3]  Backpage, through its attorneys, has represented that an identical Post ID means that the advertisement referenced in Jane Doe No. 3's email and the advertisement produced by Backpage are the same advertisement.

nowhere indicates that any "user" edit occurred.  Indeed, it does not suggest that any alteration occurred at all.  *See* Ex. R.  The fact that Backpage did not produce any version of this advertisement with the original title reflected in the email confirms that Backpage does not retain copies of original, as-submitted advertisements.  That the "administrative data" does not indicate that any edit was made to the advertisement – by the user or otherwise – casts doubt on whether Backpage's records accurately reflect which advertisements had text altered and by whom.

48.     The Senate Subcommittee found that Backpage's moderation process operated to remove explicit references to the likely illegality of the underlying transaction—not to prevent illegal conduct from taking place on its site.  *2017 Senate Report* at 2 (Ex. A).  This intended result occurred due to both the design of the process and the instructions to employees not to "look too far into things to make [advertisements] illegal."  *Senate Appendix* at 372 (Ex. V).  As one senior executive boasted about the moderation process, "[b]etween everyone's manual moderation, both in the queue and on the site . . . things are cleaner than ever in the Adult section." *Id.* at 158–163 (Ex. W).  In other words, Backpage had sufficiently altered or sanitized the advertisements so that illegal transactions involving children were not readily detectable by law enforcement.

49.     The purpose of Defendants' efforts to facilitate the success of illegal sex trafficking advertisements was understood by Backpage employees.  Several former employees testified during the course of the Senate Subcommittee investigation that (i) it was generally understood that a significant number of advertisements on Backpage.com were for prostitution, (ii) it was "common knowledge" among moderators that the illegal character of sex trafficking remains (albeit concealed) after removal of terms plainly indicating that the ad involves illegal

commercial sex, and (iii) that moderators were expected to "sanitize" advertisements involving illegal conduct in order to enhance profits. *2017 Senate Report* at 31-32 (Ex. A).

50.     The extent of Backpage's moderation practices concerning children is illustrated by the testimony of a police investigator from the Cook County, Illinois' Sheriff's Office who was involved in another lawsuit against Backpage in which the investigator, posing as a child, submitted a sting advertisement to Backpage.com entitled "Red beauty 14-18." Ex. P to Response of Senate Permanent Subcommittee on Investigations to Resp. Carl Ferrer's Surreply at 3, *Senate Permanent Subcommittee on Investigations v. Ferrer*, Misc. No. 1:16-mc-00621-RMC (D.D.C. June 2, 2016), Dkt. No. 14-2 (Ex. X).  The body of the advertisement stated, "Hello gentlemen, I'm Tracy I just graduated grade school & I'm a lil lonely and bored. I like to play and I'm very talented & you won't be disappointed. E-mail me today." *Id.*  When the advertisement posted to Backpage.com, however, Defendants had changed the title to read "Red Beauty 18," (*i.e.*, deleting "14-") and, in the body of the advertisement, changed the phrase "I just graduated grade school" to "I just graduated" (*i.e.*, deleting "grade school") to "clean" the advertisement and obscure the fact that the ad purported to sell the sexual services of a child.  *Id.*

51.     Defendants have claimed that any modification to the "Red Beauty" advertisement must have been made by the user, not by Backpage (as with the advertisement relating to Jane Doe No. 3 discussed at paragraph 47, *supra*), yet Backpage has not and, as discussed *supra*, likely cannot produce any record of any user edits.  And, as Backpage itself has pointed out, Investigator Bronson from the Cook County Sherriff's Department filed a report stating that "[t]he ad . . . was posted by the website [Backpage.com] with changes that R/I [the investigator] did not make." *See* App. B to Defs.' Mem. Law Supp. Mot. Dismiss, Dkt. 32-2, at 2 n.1 (appending Carl Ferrer's

"Corrected Surreply" in *Senate Permanent Subcomm. on Investigations v. Ferrer*, No. 1:16-mc-00621-RMC (D.D.C.)).

52.      In addition to modifying advertisements through the automated and manual moderation processes, Defendant Ferrer and senior Backpage employees routinely communicated directly with certain customers by telephone and email, and provided instructions and advice to these customers about how to conform advertisements to the model Backpage had developed. This often resulted in additional changes to the content of existing advertisements and the posting of proposed advertisements that initially had been rejected by moderators for illegal content. Indeed, according to the Defendants, 75 percent of the customers directly contacted by Defendants changed the content of their advertisements based on the instructions and advice received.  *Senate Appendix* at 187 (Ex. Y).

53.      By directly modifying the advertisements or by causing the traffickers to do so themselves, Defendants were able to take an advertisement that originally proposed to sell a child for sex and transform it into an advertisement that purported to merely advertise an adult seeking legal companionship.  This practice supported a critical business goal of Defendants to attract a high volume of activity to the website in order to grow and sustain the market perception of Backpage.com as the essential source of online support for the sellers of illegal commercial sex. Thus, each advertisement altered by Defendants contributed to the overall ability of the website to facilitate the sale of illegal commercial sex.

54.      Defendants were aware that their efforts to alter and develop the content of advertisements originally written by sex traffickers—specifically, by making critical alterations designed to transform an advertisement from one obviously soliciting illegal sex with a minor into one that would not draw meaningful law enforcement scrutiny—could subject them to both

criminal and civil liability under federal and state sex trafficking statutes.  For example, Defendant Larkin sent an email to Defendant Ferrer in which he cautioned against possible public disclosure of the alteration of content by Backpage, stating: "We need to stay away from the very idea of 'editing' the posts, as you know."  *Id.* at 432 (Ex. Z).  This reference apparently reflected Backpage's intention to structure their activities to obtain the protection from liability provided by Section 230 of the CDA.  Defendant Ferrer similarly recognized that Backpage's ability to avoid liability was "about CDA protection," *Id.* at 14 (Ex. AA), which Defendants Ferrer and Larkin understood would not extend to illegal content that Backpage itself (rather than a third party) created or developed as a result of altering advertisements to, in its own moderator's words, "put[ ] lipstick on a pig," *2017 Senate Report* at 36–37 (Ex. A).

55.     As described above, documents produced by Backpage in this action confirm that, in order to hide its material modifications to advertisements and its complicity with traffickers and their sale of children for sex, Backpage (i) deleted and kept no record of advertisements in the form they were originally submitted, and (ii) did not reliably or consistently track modifications that were made to submitted advertisements.  As a result of these practices, Backpage is able to obscure the extent of its "moderation" practices.

**D.     Backpage developed interactive website features to further assist traffickers in creating effective ads to sell sex.**

56.     In addition to Defendants' success in materially altering the content of advertisements through filtering, moderation, and direct communications with traffickers, Defendants also created posting rules designed to create an appearance of an active effort to prohibit illegal conduct by preventing the use of certain terms.  In fact, the posting process intentionally operated to provide guidance to those traffickers whom the Defendants could not coach directly by email or telephone to improve the prospect that their advertisements would reap

maximum financial returns while eluding law enforcement scrutiny.  Indeed, Defendant Ferrer stated that he wanted to be able to teach posters "what they did wrong."  *Id.* at 21 (Ex. A); *Senate Appendix* at 96 (Ex. S).

57.     Defendants accomplished this goal through an interactive platform that taught traffickers the terms and phrases that will most likely attract the attention of law enforcement, and that provided guidance on substitute language.  The Senate Subcommittee found that the purpose of Backpage's platform design was not to "actively prohibit and combat illegal content," but rather to "guide [traffickers] on how to easily circumvent those measures and post 'clean' ads." *2017 Senate Report* at 34 (Ex. A).

### E.     Beyond helping traffickers draft effective advertisements, Backpage endeavors by various other means to shield traffickers from law enforcement.

58.     In addition to controlling and assisting in drafting the content of advertisements appearing on the website, the Defendants adopted various other means to minimize risk that traffickers of children would be detected by law enforcement.  These various features of the business were intended, in combination, to grow the volume of advertising on the website, with a full understanding that these practices would increase the incidence of advertisements involving children, and to extend the period of time during which a given child would be exploited.

59.     For example, the Defendants made it difficult, if not impossible, to track any photographs posted on Backpage.com. Any photograph taken by traffickers is embedded with "metadata" when it is uploaded to the website.  This metadata consists of identifying information that typically reflects the date, time, geolocation, and other identifying information.  However, Defendants adjusted their server software, at additional expense, to erase the metadata from each uploaded photo, so as to impede efforts by law enforcement to use the photo to identify the

trafficked child or to track the traffickers Backpage has partnered with to sexually exploit children.

60.    The Defendants also helped traffickers evade prosecution by allowing them to post their phone numbers by spelling out the digits of their numbers rather than using numerals.  For example, the numerals "617" can be written instead as "six-1-seven."  This format makes it nearly impossible for law enforcement to scan posts for numbers, identify trackers, and conduct sting operations to rescue children.  Given that the Defendants were already materially altering approximately 80 percent of escort advertisements, it would have been easy to rewrite all telephone numbers using numerals or, more simply, to require posters to enter a numerical phone number, as Backpage does for other sections of its website.

61.    In addition, Defendants did not require traffickers to verify the phone numbers they posted in connection with an advertisement in the "Adult Entertainment" section, despite requiring this verification for other sections of its website.  In effect, Backpage makes it harder for someone to sell a dog or cat in its "Pets" section than it does for someone to sell a child for sex in its "Adult Entertainment" section.  Anyone trying to sell a dog or cat through "Pets" must verify his or her telephone number, while anyone trying to sell a child for sex through "Adult Entertainment" need not.  Backpage understands that the telephone verification process creates an additional record and evidentiary trail that law enforcement could use to break up the trafficking scheme and, in not requiring such verification, Backpage eliminated one of the avenues available to contact victims and help rescue them.

**F.    Backpage continues to develop its model to increase demand and its own market share for illegal commercial sex, including sex with children.**

62.    Backpage has continuously enhanced its business model to increase demand, to grow its market share, and to enhance Defendants' own profits.

63.     For example, Defendants are known to draft and post fake advertisements for illegal commercial sex on Backpage.com to create the appearance of an exceptional level of patronage of the website, and to thus foster the impression among traffickers and customers alike that Backpage.com is the most desirable site in the online sex business.  In addition, Defendants are known to contact traffickers already using other sites to advertise illegal commercial sex and encourage them to switch and use Backpage.com's services.

64.     Defendants Ferrer, Lacey, and Larkin also created two additional websites, EvilEmpire.com ("EvilEmpire") and BigCity.com ("BigCity").  Defendants provide all of the content hosted, published, and featured on EvilEmpire and almost all of the content on BigCity.  Third parties are unable to post on EvilEmpire.

65.     EvilEmpire creates a webpage for each trafficker, without even notifying the trafficker that the page has been created, that is identified and sorted by his phone number, in which all of the trafficked adults and children controlled by that trafficker are listed for purchase.  Clicking on one of the advertisements redirects the purchaser to the full advertisement initially posted on Backpage.com.  Some of these advertisements also feature a link for the same advertisement posted on BigCity.  Often the same trafficked child will be featured in different advertisements with different names and different ages, all on the same trafficker's EvilEmpire webpage.

66.     A cursory view of such a webpage makes it clear that the ages listed are false.  Defendants use EvilEmpire to further their trafficking venture with the traffickers and to make the sale of trafficked adults and children more efficient and profitable.  By creating the EvilEmpire webpages, Defendants knowingly conspire with traffickers to falsely represent that a trafficked child is over 18.

67.     BigCity is organized in a similar manner and is similarly designed to increase the profit of and demand for Backpage's sex trafficking ventures.  However, where EvilEmpire organizes webpages by trafficker, BigCity organizes its webpages by trafficked child or adult. BigCity's homepage is comprised of a grid of pictures of naked or nearly naked individuals in erotic poses, and each picture is a link to the trafficked adult's or child's "profile," which includes that individual's name, age, phone number, and location.  Defendants historically had exclusive control over the content of BigCity, as they do with EvilEmpire.  However, although Defendants continue to create the majority of the profiles on BigCity, traffickers can now create their own "profiles" for their trafficked adults and children.

68.     Defendants systematically cross-post advertisements on Backpage.com, BigCity, and EvilEmpire, often without the knowledge of the trafficker or user who submitted the original ad.  Defendants know that listing advertisements on all three of its websites increases the likelihood that the traffickers will complete a sale.  By operating and providing content to these websites, Defendants effectively partner with traffickers to make the sale of illegal sex easier and more lucrative.  And, as Defendants strip the metadata from advertisements on the main Backpage.com website, Defendants similarly strip the metadata from photographs on BigCity and EvilEmpire to protect the traffickers who participate in their joint venture.  Defendants intentionally designed and currently run EvilEmpire and BigCity to help traffickers posting on Backpage.com increase their exposure to potential purchasers without increasing their risk of detection by law enforcement.

**G.    Backpage attempted to obscure its active participation in sex trafficking by characterizing itself as the "Sheriff of the Internet."**

69.     In or around 2010, as Backpage.com began to emerge as a significant presence in the online sex advertising business, Defendants developed a plan to minimize the attention

devoted to its activities by the public and by law enforcement agencies, particularly concerning advertising of children on its website.

70.     Defendants undertook to forge seemingly cooperative relationships with many law enforcement agencies and to convey the impression that they were (i) actively and successfully engaged in efforts to identify and report child sex trafficking victims and (ii) otherwise "partnering" with law enforcement to minimize the risk of exploitation of children on the website. As part of this façade, the Backpage Defendants regularly asserted that they were engaged in efforts to stop child sex trafficking through Backpage.com. Indeed, Defendants regularly characterized themselves as the "sheriff" of the Internet helping to defeat the "scourge" of online child sex trafficking.

71.     To further this scheme, Defendants initiated numerous interactions with state and federal law enforcement agencies beginning in or about 2010. Defendants provided assurances to these agencies that they would be vigilant in attempting to detect unlawful trafficking of minors through various means, would improve and increase the volume of reporting of suspicious advertisements, and would be a model for cooperation with law enforcement efforts.

72.     Despite these representations, Defendants intended only to engage in the most superficial efforts to work with these agencies, and only to the extent necessary to divert the attention of these agencies from the growing market share and business success of Backpage.com.   For example, Defendants made promises to aggressively report suspected instances of child sex trafficking to NCMEC, the leading nonprofit organization in the United States working with law enforcement, families, and the professionals who serve them on issues related to missing and sexually exploited children. Despite those representations, Defendants took affirmative steps internally to assure that the reporting was both superficial and minimal. *Senate*

*Appendix* at 309 (Ex. BB).  In addition, at one point, Defendants considered implementing a faulty photo verification process on Backpage.com that would be "easy to get around" in order to "create a false sense of security."  Indeed, Defendants thought that having such a system "riddled with loopholes" would allow the Defendants to "stop reporting to NCMEC" altogether.  *Senate Appendix* at 286 (Ex. CC).

73.     The promises by Defendants to law enforcement about aggressive reporting of child sex advertisements were a Potemkin-like subterfuge.  By various means, Backpage actively managed its systems to minimize the number of advertisements reported to NCMEC, to avoid confirming the high frequency of child sex trafficking on its website.  For example, a senior Backpage executive set an artificial quota of no more than 16 reports to NCMEC daily from all 394 markets served by the website, despite knowing more advertisements for minors existed. *Senate Appendix* at 309 (Ex. BB).  Similarly, Backpage supervisors who did "not report young looking escorts" to NCMEC nevertheless received "very good" evaluations without any admonition to improve their reporting of child sex advertisements.  *Id.* at 307–308 (Ex. DD), 310– 311 (Ex. EE).  In one instance, a Backpage supervisor admonished a moderator for reporting to NCMEC a girl who looked "young," "drugged," and "ha[d] bruises."  *Id.* at 381–383 (Ex. FF). As the Defendants noted: "were [*sic*] not trying to Bust [traffickers]," we just wanted to "clean up the front page" because "law enforcement rarely goes past page 2" on each advertisement.  *Id.* at 405 (Ex. Q).

74.     Defendants also developed internal policies governing the removal of advertisements designed to provide a public façade of concern with child sex trafficking, but which Defendants intended to be ineffective.  For example, if Backpage is notified that an advertisement in a particular market involves a child, Backpage will only consider removing the

advertisement in that market, and it will report the advertisement to NCMEC only if the information is communicated by an immediate family member of the child in the advertisement. *Id.* at 318 (Ex. GG).   Indeed, Defendants refused to take down advertisements for trafficked children when alerted by third parties—and even in one case, by the trafficked minor herself— that the individuals advertised on Backpage.com were minors.  *2017 Senate Report* at 40 (Ex. A). Additionally, in those rare instances that Backpage does agree to take down a specific advertisement, it takes no steps to remove or report *other* advertisements for the same child, including even *identical* advertisements that are posted in other geographical regions.  Defendants do not identify or report other advertisements that are linked to the reported advertisement, and they do not identify or report advertisements involving the same phone number, web address, or other identifying information indicative of trafficking of that child or other children.

75.    These practices were designed to conceal the extent of child sex trafficking on Backpage.com, as well as Defendants' knowledge of and efforts to exploit and profit from those advertisements.  As Defendants intended, these misrepresentations and manipulations served to protect the ability of traffickers to advertise children for sale through the website, to burnish Backpage.com's reputation among human traffickers as a "safe" and favorable place to advertise sex trafficking victims, including children, and thereby to grow market share and increase profitability.

**H.    Defendants Ferrer, Lacey, and Larkin attempted to conceal their continuing participation in sex trafficking by selling the company through foreign shell companies.**

76.    After public attention to the activities of Defendants began to escalate in or about 2014, and following the initiation of several lawsuits by children sold through Backpage.com, it became apparent to Defendants that their efforts to brand themselves as the "sheriff" of the Internet eventually would be exposed as false.  As a result, Defendants purportedly sold the

company in December 2014 to an undisclosed foreign company. The Senate Subcommittee's investigation eventually revealed, however, that "the company's true beneficial owners [remain] James Larkin, Michael Lacey, and Carl Ferrer." The Senate further found that

> [a]cting through a series of domestic and international shell companies, Lacey and Larkin loaned Ferrer over $600 million for the purchase. While Ferrer is now the nominal owner of Backpage, Lacey and Larkin retain near-total debt equity in the company, continue to reap Backpage profits in the form of loan repayments, and can exert control over Backpage's operations and financial affairs.

*2017 Senate Report* at 42 (Ex. A).

77. The Senate Subcommittee could discern no economic rationale for the sale or the elaborate corporate structure created by Defendants, noting that the Dutch company serves as merely a "pass through" entity that provides the company no known tax benefits. *Id.* at 50 (Ex. A). Rather, the Senate Subcommittee concluded that the purpose of the sale was "to obscure the identity of the purchaser" and owner. *Id.* at 46 (Ex. A).

**I.      Defendants participated in trafficking Jane Doe No. 1 on Backpage.com when she was a minor.**

78. Jane Doe No. 1 was trafficked and sold for sex by traffickers—with the knowledge, participation, and aid of Backpage—to men across Massachusetts, New York, Connecticut, New Hampshire, and Maine who paid Jane Doe No. 1's traffickers to rape her. Jane Doe No. 1 estimates that she was raped over 600 times over the course of approximately four months at age 15.

79. Jane Doe No. 1 was first trafficked on Backpage.com in November 2013, when she was 15 years old, after leaving her parents' home and seeking help from a male relative. That male relative submitted ads of Jane Doe No. 1 to Backpage.com and told her she had to go make

money for him and his associates by having sex with the men who responded to the advertisements.

80.     Over the course of four months, her relative and three associates trafficked Jane Doe No. 1 for sex on Backpage.com.  She was typically sold six days a week, and up to ten times a day.  Jane Doe No. 1 was forced to do "in-calls," where she was raped at the hotel she was placed in by her traffickers, as well as "out-calls," where she was raped at locations chosen by the men buying her.

81.     Defendants knew Jane Doe No. 1 was being trafficked for sex on Backpage.com. As described in detail in paragraphs 28–55, *supra*, during all relevant times, Defendants reviewed (*i.e.*, "moderated") every advertisement in the Adult Entertainment section of Backpage.com, which included the advertisements featuring Jane Doe No. 1 when she was 15 years old.

82.     Jane Doe No. 1's trafficker attempted to indicate in advertisements he submitted to Backpage.com that Jane Doe No. 1 was a minor. Upon information and belief, Backpage materially altered the explicit language of these advertisements, removed certain words, and redrafted the advertisements to suggest Jane Doe No. 1 was an adult in the advertisements that were ultimately posted on the website.  Upon information and belief, in advertisements for Jane Doe No. 1, Backpage deleted words and/or images signaling the involvement of a child through the use of its automated filtering software (which included its list of prohibited terms) and/or through removal or alteration by its moderators, as is Backpage's regular practice.

83.     As just one example of this material modification, Jane Doe No. 1 was advertised as a "Latina shorty" in the heading of an advertisement submitted to Backpage.com, and in that advertisement (and many others), she was also described as "fetish-friendly" in the narrative. "Shorty" or "shortie" is a slang term that can signify a young girl, and "fetish-friendly" is an

29

expression commonly used by sex traffickers to indicate that they are willing to let buyers pay extra to engage in especially violent and denigrating sexual conduct, commonly including slapping or choking.  On information and belief, sometime after these advertisements were submitted to Backpage.com, Backpage deleted the phrase "Latina shorty," substituting the phrase "Exotic Latina."  The removal of the term "shorty" – which signals a child – and the simultaneous replacement of that term with "exotic" – which means "foreign" – successfully transformed the advertisement from one explicitly selling a minor for sex to one that purported to sell a "foreign" adult (while retaining the open invitation for customers to treat Jane Doe No. 1 in a violent or otherwise seriously abusive manner).

84.     The advertisements posted on Backpage.com offering Jane Doe No. 1 for sale generally included one or more photographs of Jane Doe No. 1.  These photographs omitted or obscured her face but displayed her shoulders, legs, buttocks and/or breasts.

85.     After some months, Jane Doe No. 1's mother identified her photographs on Backpage.com and, soon afterwards, law enforcement conducted a "sting" operation to rescue Jane Doe No. 1.

### J.      Defendants participated in trafficking Jane Doe No. 2 on Backpage.com when she was a minor.

86.     Jane Doe No. 2 was trafficked and sold for sex by traffickers—with the knowledge, participation, and aid of Backpage—to men across Massachusetts and Connecticut who paid Jane Doe No. 2's traffickers to rape her.  Jane Doe No. 2 estimates that she was raped several thousands of times over the course of three years between the ages of 14 and 17.

87.     Jane Doe No. 2 was first trafficked on Backpage.com in 2013 when she was 14 years old.  She was sold by a female relative who submitted ads of Jane Doe No. 2 to

Backpage.com.  She was later transferred to and sold by male family friends repeatedly until she was 17 years old.  These traffickers also submitted ads of Jane Doe No. 2 to Backpage.com.

88.     Over the course of three years, her relative and several associates trafficked Jane Doe No. 2 for sex on Backpage.com.  She was typically sold seven days a week, up to eleven times per day.  Jane Doe No. 2 was forced to do "in-calls," where she was raped at her home or hotels she was placed in by her traffickers, as well as "out-calls," where she was raped at locations chosen by the men buying her.

89.     Jane Doe No. 2's traffickers used pre-paid credit cards to pay for the advertisements.  The traffickers paid extra to have the advertisements reposted by Backpage.com, in order for them to appear at the top of the search page.

90.     Usually Jane Doe No. 2's traffickers drafted advertisements that included a pseudonym, her availability, and phone number.  On a few occasions, the traffickers required Jane Doe No. 2 to post advertisements for herself.

91.     The advertisements for Jane Doe No. 2 were posted to Backpage.com from various locations in Massachusetts and Connecticut.

92.     Defendants knew Jane Doe No. 2 was being trafficked on Backpage.com.  As described in detail in paragraphs 26–55, *supra*, during all relevant times, Defendants reviewed (*i.e.*, "moderated") every advertisement in the Adult Entertainment section of Backpage.com, which included the advertisements featuring Jane Doe No. 2 when she was 14 years old.

93.     Jane Doe No. 2's traffickers attempted to indicate in advertisements posted on Backpage.com that Jane Doe No. 2 was a minor.  Upon information and belief, Backpage materially altered the explicit language of these advertisements, removed certain words, and redrafted the advertisements to suggest Jane Doe No. 2 was an adult in the advertisements that

were ultimately posted on the website.  Upon information and belief, in advertisements for Jane Doe No. 2, Backpage deleted words and/or images signaling the involvement of a child through the use of its automated filtering software (which included its list of prohibited terms) and/or through removal or alteration by its moderators, as is Backpage's regular practice.

94.     As just one example of this material alteration, Jane Doe No. 2's trafficker initially attempted to include photographs in the advertisements she submitted to Backpage.com that showed Jane Doe No. 2's genitals and face, and which plainly showed to any reasonable person that Jane Doe No. 2 was an exploited child.  After these advertisements were submitted to Backpage.com, Backpage removed the photographs showing that Jane Doe No. 2 was a child from the proposed advertisements, and then allowed the materially altered advertisements to post on the website.

95.     Additionally, on information and belief, Backpage also materially altered language in the proposed advertisements that signaled that Jane Doe No. 2 was a child, in order to suggest that Jane Doe No. 2 was an adult.

96.     On information and belief, Jane Doe No. 2's relative eventually began modifying the posts to conform to Backpage's stated policies and coaching practices.  More specifically, on some occasions she cropped Jane Doe No. 2's face from the nude photographs and on others used photographs of adult females.  Further, knowing that Backpage would and did remove overt language that signaled that Jane Doe No. 2 was a minor, the trafficker eventually drafted the advertisements without using such words or phrases.

### K.     Defendants participated in trafficking Jane Doe No. 3 on Backpage.com when she was a minor.

97.     Jane Doe No. 3 was trafficked and sold for sex by a trafficker—with the knowledge, participation, and aid of Backpage—to men across Massachusetts and Florida who

paid Jane Doe No. 3's trafficker to rape her.  Jane Doe No. 3 estimates that she was raped hundreds of times over the course of several months.

98.     Jane Doe No. 3 was trafficked on Backpage.com between 2014 and 2016, beginning when she was approximately 15 years old.  She was first sold by her ex-boyfriend.

99.     Over the course of several years, her trafficker sold Jane Doe No. 3 for sex on Backpage.com.  She was typically sold seven days a week, and up to twelve times a day.  Jane Doe No. 3 was forced to do "in-calls," where she was raped at the hotel she was placed in by her traffickers, as well as "out-calls," where she was raped at locations chosen by the men buying her.

100.    Jane Doe No. 3's trafficker paid extra to have the advertisements reposted by Backpage.com in order for them to appear at the top of the search page.

101.    Defendants knew Jane Doe No. 3 was being trafficked on Backpage.com.  As described in detail in paragraphs 26–55, *supra*, during all relevant times, Defendants reviewed (*i.e.*, "moderated") every advertisement in the Adult Entertainment section of Backpage.com, which included the advertisements featuring Jane Doe No. 3 when she was 14 years old.

102.    Jane Doe No. 3's trafficker attempted to indicate in advertisements posted on Backpage.com that Jane Doe No. 3 was a minor.  When the trafficker proposed language that plainly communicated that Jane Doe. No. 3 was a child, on information and belief, Backpage materially altered the explicit language, removed certain words, and redrafted the advertisement to suggest Jane Doe No. 3 was an adult.

103.    Upon information and belief, Backpage deleted words and/or images signaling the involvement of a child through the use of its automated filtering software (which included its list of prohibited terms) and/or through removal or alteration by its moderators, as is Backpage's regular practice.

33

104.    With Backpage's coaching, Jane Doe No. 3's trafficker eventually was able to identify the specific words and phrases that signaled a child was involved that had caused the Defendants to materially alter the advertisement.  Because Jane Doe No. 3's trafficker wanted to advertise the fact that Jane Doe No. 3 was a child for sale, he stopped using explicit language and, instead, began to use emojis to communicate that he was selling a child for sex.  This, Backpage permitted.  For example, after Backpage blocked the word "girl" or "girls" from appearing in advertisements, Jane Doe No. 3's trafficker would instead use, or instruct Jane Doe No. 3 to use, the "girl" emoji.

105.    On information and belief, Defendants fully understood the meaning of the emojis and permitted them to be used because they believed that law enforcement could not effectively search for emojis, and, even if they could do so, law enforcement were unlikely to understand the meaning of the emojis.

106.    Jane Doe No. 3's trafficker sometimes required Jane Doe No. 3 to write advertisements for herself.  Jane Doe No. 3 was instructed to use emojis in her advertisements. She used, among others, emojis depicting (i) "make-up" and "nails" to signal to buyers that she was a minor, (ii) "girl" to signal that she was a minor, (iii) "peach" to signal that she would allow buyers to touch her buttocks, (iv) "water drops" to signal that she would engage in activity that involved the exchange of bodily fluids, *i.e*., sexual activity, (v) "pineapple" to signal the taste of her bodily fluids, and (vi) "money bag," "dollar bills with wings," or "cherries" to signal that she was available for sale.

107.    Jane Doe No. 3's trafficker frequently included photographs in the advertisements that he submitted to Backpage.com, some of which showed Jane Doe No. 3's bare breasts, genitals, and/or face.

108.   During limited discovery in this action, Backpage produced sixteen[4] advertisements featuring Jane Doe No. 3 that were posted on Backpage.com in 2016, when Jane Doe No. 3 was 16 and 17 years old.  "Administrative data" produced by Backpage shows that, of these 16 advertisements, Backpage moderators deleted photographs from eight of them (50 percent).   In four of the 16 advertisements (25 percent), Backpage moderators deleted photographs that included at least part of Jane Doe No. 3's face.  Furthermore, based on Jane Doe No. 3's recollections of photographs that she provided to her trafficker and knowledge of her trafficker's usual practices with respect to preparing advertisements for Backpage.com, Jane Doe No. 3 believes that Backpage moderators cropped her face out of photographs in approximately half of the advertisements.

109.   The photographs that Backpage moderators deleted from these advertisements were not consistent across advertisements (*i.e.*, certain photographs that were deleted from one advertisement were not always deleted from other advertisements).   The photographs that remained in the posted advertisements often displayed Jane Doe No. 3's shoulders, legs, buttocks, genitals, and/or breasts.

110.   Although Backpage refused to produce any advertisements featuring Jane Doe No. 3 from 2014 and 2015,[5] when Jane Doe No. 3 was 14-16 years old, it is reasonable to infer—as Plaintiffs do upon information and belief—that Backpage similarly deleted or cropped out Jane

---

[4] Backpage produced copies of 19 advertisements during limited discovery in this action; of those, three did not feature Jane Doe No. 3.

[5] During the limited discovery process in this matter, Backpage conducted a search for advertisements featuring Jane Doe No. 3 that encompassed only those advertisements associated with a particular email address (provided by Plaintiffs) that was used by Jane Doe No. 3 and her trafficker in 2016, and certain phone numbers associated with that email address.  Jane Doe No. 3 is aware (and made clear to Defendants, including through sworn responses to interrogatories) that advertisements featuring her were posted on Backpage.com in 2014 and 2015 using other email addresses.

Doe No. 3's face from advertisements submitted to Backpage.com in 2014 and 2015, thereby purposely obscuring the fact that Jane Doe No. 3 was a minor being sold for sex.  Such pictures would have made clear to any reasonable person that Jane Doe No. 3 was a child.

**CLAIMS FOR RELIEF**

**COUNT I**

**Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595**

111.    The allegations set forth in paragraphs 1 through 110 are hereby incorporated by reference.

112.    Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are victims of child sex trafficking within the meaning of 18 U.S.C. § 1591 and are entitled to bring a civil action under 18 U.S.C. § 1595 against any individual or entity whose violations of the TVPRA proximately caused Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 to sustain physical and psychological injuries.

113.    The Defendants knowingly benefited financially from participation in illegal child sex trafficking ventures in violation of the TVPRA, 18 U.S.C. § 1591(a)(2), by, *inter alia,* engaging in acts and omissions that were intended to support, facilitate, and further traffickers' marketing, transportation, and sale of child victims for commercial sexual exploitation.

114.    Defendants knew or recklessly disregarded the fact that Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 were minors being trafficked for sex on Backpage.com, and Defendants took affirmative steps to decrease the likelihood that law enforcement would be able to detect and prevent these trafficking ventures, which in turn increased the number of times Plaintiffs were raped by men who bought them on Backpage.com.

115.    Defendants also knew that their efforts to enhance the success of their website likely would increase the overall volume of illegal commercial sex online, and that their ability

to conceal the incidence of children included among those advertisements would tend to increase the number of children sold for sex online.  In this respect, Defendants knowingly benefited from participation in the trafficking of children generally on Backpage.com.

116.    Defendants knowingly benefited financially from the daily advertisements that successfully sold Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 for sex, and participated in the trafficking ventures that exploited them by the various means described herein.

117.    Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 have suffered substantial physical and psychological injuries, and other damage, as a result of being trafficked through Backpage.com.

## COUNT II
### Unfair and Deceptive Practices in Violation of Mass. Gen. Laws c. 93A § 2(a)

118.    The allegations set forth in paragraphs 1 through 110 are hereby incorporated by reference.

119.    Defendants are engaged in trade or commerce within the meaning of M.G.L. c. 93A.

120.    Defendants have committed various knowing and willful unfair and deceptive acts and practices proscribed by M.G.L. c. 93A, § 2.  These actions include, but are not limited to, doctoring advertisements for illegal commercial sex concerning each Plaintiff, as well as other children, in a manner to convey the false impression that the proposed transaction involved an adult rather than a child.  These actions extended the time period during which Plaintiffs were exploited and thus the number of instances in which each of them was raped.

121.    Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 have suffered substantial physical and psychological injuries, and other damage, as a result of Defendants' conduct.

122.    Defendants do not have a place of business or maintain assets in

Massachusetts.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs seek for judgment against the Defendants:

a.      The actual and compensatory damages determined to have been suffered by each plaintiff;

b.      Punitive damages;

c.      Costs and reasonable attorney's fees;

d.      Such injunctive relief as the Court deems appropriate;

e.      Such further relief as the Court may deem just and equitable.

The Plaintiffs demand a trial by jury on all issues so triable.

                                        JANE DOE NO. 1, JANE DOE NO. 2,
                                        and JANE DOE NO. 3

                                        Respectfully submitted,

                                        _/s/ John T. Montgomery_____ _____

                                        John T. Montgomery (BBO #352220)
                                        Aaron M. Katz (BBO #662457)
                                        Jessica L. Soto (BBO #683145)
                                        Rebecca C. Ellis (BBO #685729)
                                        Matthew D. LaBrie (BBO #693698)
                                        ROPES & GRAY LLP
                                        800 Boylston Street
                                        Boston, MA 02199
                                        T: (617) 951-7000
                                        Email: john.montgomery@ropesgray.com
                                             aaron.katz@ropesgray.com
                                             jessica.soto@ropesgray.com
                                             rebecca.ellis@ropesgray.com
                                             matthew.labrie@ropesgray.com
                                        Jolene L. Wang (*pro hac vice*)
                                        ROPES & GRAY LLP
                                        1121 Avenue of the Americas
                                        New York, NY 10036
                                        T: (212) 596-9000
                                        Email: jolene.wang@ropesgray.com

Dated: April 12, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of April, 2018, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  I further hereby certify that on the 11th day of April, 2018, exhibits C, D, R, and U, which will be filed under seal, were sent separately via encrypted electronic mail to the same registered participants.

/s/ John T. Montgomery
Dated:  April 12, 2018                              John T. Montgomery